GENERAL TELEPHONE COMPANY OF THE SOUTHWEST V.

CITY OF WELLINGTON ET AL *

No. A-5395. Decided October 3, 1956.
Rehearing Overruled November 7, 1956.
(294 S.W. 2d Series 385)

*See General Telephone Co. v. City of Eden, this volume, Ante page 168.

*Don S. Holdridge,* of San Angelo, and *Joe A. Keith,* of Sherman, for petitioner.

The trial court and the court of civil appeals erred in holding that the "status quo" to be preserved by a temporary injunction is the rate sought to be enjoined; that the ordinance was not shown to be confiscatory; in not holding that petitioner had satisfied, as a matter of law, all equitable requirements for issuance of temporary injunction and that denial of temporary injunction was an abuse of the trial court's discretion. City of Baytown v. General Tel. Co. of Southwest, 256 S.W. 2d 187, writ of error refused n.r.e.; Lone Star Gas Co. v. State, 153 S.W. 2d 681; Southland Life Ins. Co. v. Egan, 126 Texas 160, 86 S.W. 2d 722.

*Paulman Spillman,* of Wellington, for respondent.

In replying to petitioner's points of law cited: Southwestern Associated Tel. Co. v. City of Dalhart, 254 S.W. 2d 819, writ of error n.r.e.; City of Sweetwater v. Hamner, 259 S.W. 191, writ of error refused; City of Paris v. Sturgeon, 110 S.W. 459.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The subject matter of this suit is that of temporary injunctions in telephone rate disputes arising under Art. 1119, Vernon's Texas Civ. Stats., copied in footnote.[1]

Our petitioner, General Telephone Company of the Southwest (plaintiff below) complains of the denial by the trial

---

[1]Art. 1119. "The governing body of all incorporated cities and towns in this State incorporated under the General Laws thereof shall have the power to regulate, by ordinance, the rates and compensation to be charged by all persons, companies, or corporations using the streets and public grounds of said city or town, and engaged in furnishing water, gas, telephone, light, power or sewerage service to the public, and also to prescribe rules and regulations under which such commodities shall be furnished, and service rendered, and to fix penalties to enforce such charges, rules, and regulations. The governing body shall not prescribe any rate or compensation which will yield more than a fair return upon the fair value of the property used and useful in rendering its service to the public, but which return in no event shall ever exceed eight (8) per cent per annum."

court and Amarillo Court of Civil Appeals of a temporary injunction restraining the respondents, City of Wellington, its Mayor and City Council members (defendants below) from requiring, by prosecution under a penalty ordinance (No. 332, approved August 24th, 1954) or otherwise, the observance by petitioner of the terms of a rate ordinance (No. 333 approved September 14th, 1954) fixing the charges for petitioner's local telephone service rendered "subscribers residing within the city limits of the City of Wellington." The judgment as here complained of also refused to restrain the respondents City and others "From interfering in any way with the plaintiff in * * * collecting fair and reasonable * * * charges for telephone service in the City of Wellington, Texas, until such time as the defendant City Council shall prescribe fair and reasonable rates and charges." For the opinion of the appellate court see 279 S.W. 2d 922. As hereinafter further explained, we think this action was erroneous.

Actually the suit began prior to the passage of the rate ordinance in question (No. 333, supra), but while it was pending the petitioner made representations to the respondents in their official capacity for an increase in rates. Thereafter Ordinance No. 333 was passed providing an increase which, while substantial, was yet not sufficient in the view of the petitioner to make its permitted return nonconfiscatory.

Petitioner's pleadings contemplated that, if the temporary injunction was granted, petitioner would proceed, pending further action of the City, to collect such charges as petitioner should itself fix as reasonable, and in this behalf offered to put up an adequate bond guaranteeing the return to each subscriber of any overcharges which might develop to have been such as the result of the final decree.

Petitioner's pleadings, which were duly verified and accompanied by affidavits, including financial statements and calculations, alleged in brief that the rates prescribed by Ordinance No. 333 would result in a return to it of somewhat less than 2% of the fair value of its properties employed in the business.

These allegations and figures were all upon the basis of the so-called "Wellington, Texas, Local Exchange," an enterprise or activity of the petitioner, being a single telephone exchange, furnishing ordinary local call service at regular monthly rates to all subscribers in the community centering in and including the City of Wellington. Although the "exchange" thus neces-

sarily included a substantial amount of property and number of subscribers located outside the city limits, the profit and loss accounting was kept, and the petitioner's instant case was presented for all practical purposes, like that of any other single community business would have been run and accounted for, that is, as if the city limit lines did not exist.

The pleadings of the respondents included a sworn plea in abatement, many pages of special exceptions, and an unsworn answer consisting of a general denial and other matters not now necessary to mention.

Nowhere did the respondents plead under oath (or otherwise unless as a result of the general denial) that the ordinance rates were reasonable or nonconfiscatory, or that any of the figures submitted by the petitioners as to valuation of properties or otherwise were erroneous or that any sort of separation of accounts of the properties and operations exclusively within the city from those without would have shown the ordinance rates to have been reasonable.

Upon the hearing the petitioner telephone company supported its sworn pleadings with the testimony of various of its officers or other purportedly expert witnesses. The respondents, although cross examining the witnesses and making numerous objections to their testimony, introduced no evidence whatever of their own, nor elicited any admission from the petitioner's witnesses that the ordinance rates were reasonable or nonconfiscatory, or that, unless as hereinafter discussed, the figures submitted by the petitioner were erroneous.

The theories of the trial judge in denying the temporary injunction are largely reflected in his "Conclusions of Law," copied fully in the footnote.[2] His "Findings of Fact" therein referred to consisted largely of the text of Ordinances Nos. 332 and 333 and general conclusions to the effect that the City, while not having changed or modified either ordinance, was yet taking no affirmative action against the petitioner under either. In response to a subsequent request by the petitioner for addi-

[2]"From the above the Court concludes that the status quo was the existing telephone rates provided for in Ordinance No. 333 above mentioned, and that in the absence of proof that the City of Wellington was attempting to inforce, by suit or otherwise, the collection of telephone rates set forth in such Ordinance No. 333, and in the absence of any evidence showing that the City of Wellington was attempting to inforce such Ordinance against the Plaintiff by the collection of any fine or penalty as a result of criminal prosecution against plaintiff for its failure to comply with the rates set forth in said Ordinance No. 333 and as provided for by Ordinance No. 332, the Temporary Injunction should be denied."

tional findings, the court (a) expressly refused to find that the prescribed rates would be or that they would not be found on final hearing to be confiscatory; (b) found the confiscatory character of said rates to be subject to "reasonable doubt," and to constitute "a seriously debatable issue;" (c) found in effect that, even though an injunction might issue on final hearing, the petitioner would yet be unable to make or collect retroactive charges so as to compensate itself for the services meanwhile rendered by it at the rates fixed by the ordinance; and (d) approved the bond tendered by the petitioner as good and sufficient and "adequate to protect the customers of plaintiff under * * * a temporary injunction, had one been granted by the court."

The Court of Civil Appeals, in affirming, gave as a general reason for its action that the record showed no abuse of discretion by the trial court, quoting at length in this behalf from City of Baytown v. General Telephone Co. of the Southwest, Texas Civ. App., 256 S.W. 2d 187, (writ of er. refused, no reversible error) which sustained a temporary injunction against enforcement of ordinance rates. As actual or possible subsidiary or alternative reasons it mentioned: (a) that a temporary injunction is always properly refused where the record shows an actual net return, however small, on the fair value of the properties, from the rates sought to be enjoined; (b) absence of evidence showing "what the rates are outside of the city limits" and of "evidence separating the values in the city and the rural areas." (In this connection the court observed that it did not have to pass on the City's contention that the City had no power to regulate rates beyond its borders); (c) that the *status quo* was the ordinance rate. The court also observed (d) that "What was a reasonable rate of return was not to be determined by this requested injunction and neither is there a showing that the purported increase would not have produced more than the eight per cent permitted under the law."

■ The appellate court evidently, and we think correctly, disregarded what appears to have been one of the trial court's two primary reasons for its action, to wit, the fact that the respondents were not then threatening enforcement of the ordinance rates. The petitioner could not assume that it was free, without benefit of judicial protection, to disregard the formal pronouncement of the body authorized by statute to establish rates. Still less could it assume, that, if it ignored the rate ordinance, the City would fail to take recourse to the penalty ordinance which the City itself had recently enacted.

The other primary ground of the trial court's judgment was approved by the Court of Civil Appeals to the effect that the *status quo* to be preserved by temporary injunction in cases like the present is the rate sought to be enjoined. This, as the petitioner correctly contends, is in clear conflict with City of Houston v. Southwestern Bell Tel. Co., Texas Civ. App., 263 S.W. 2d 169, wr. of er. refused, and the City of Baytown case, supra, and must yield thereto.

The respondents, evidently referring to observation (d) of the appellate court above quoted, state that it "* * * properly held there was no showing in the record that the purported increase would not have produced more than eight per cent (8%) permitted under the law because no evidence was offered as to what the rate of return would have been within the city limits of the City of Wellington, Texas." Since "purported increase" would seem necessarily to refer, not to the ordinance rates in suit, but to the rates which the petitioner had unsuccessfully asked the City to establish, the argument is not relevant. It was so pointed out in the City of Houston case, supra. The true question in connection with the petitioner's allegations and proof of a single exchange operation is as to how the latter may demonstrate or fail to demonstrate the unreasonableness of the rates sought to be enjoined. We will return to this "single exchange" question later.

Nor can we agree that the refusal of the injunction is to be supported by the petitioner's admission of an actual net return on the fair value of its properties (less than 2 per cent) under the rates sought to be enjoined. The one decision cited in support of this proposition, Lone Star Gas Co. v. State, does not so decide. The brief statement in that opinion to the effect that any net return, however small, precludes a claim of "confiscation" (137 Texas 279, 306, 153 S.W. 2d 681, 696) occurred in the course of an exposition of this Court's disagreement with the view of the court below that Art. 6059, Vernon's Texas Civ. Stats. (review of Railroad Commission gas rate orders) "does not contemplate a de novo fact trial in the district court in gas rate order cases even where the issue of confiscation is tendered and tried." 137 Texas 289-290, 153 S.W. 2d 687. The same opinion also stated (137 Texas 312, 153 S.W. 2d 699) as do some earlier decisions such as Railroad Commission v. Houston & T.C. Ry. Co., 90 Texas 340, 38 S.W. 750, and Gulf C. & S.F. Ry. Co. v. Railroad Commission, 102 Texas 338, 113 S.W. 741, 116 S.W. 795, that in the absence of a statute providing for judicial review as to "reasonableness" of rates (there is none

such as to review of city telephone rate orders made under Art. 1119, supra) the only power of interference by courts with the legislative act of rate making is the "equity" power of preventing what would be a violation of the national and state constitutional guarantees against the taking of property without proper compensation or without due process of law.

While the language in the two railroad rate decisions mentioned does lend support to the distinction between unreasonableness and confiscation, the actual question of whether a rate order that "merely fails to yield a fair profit or return * * * is unreasonable and unjust, but not confiscatory" (in the sense of an unconstitutional "taking") was not presented for decision in either case. Certainly the Lone Star case did not actually decide that proposition. There, except on certain points not here material, our decision favored the utility—and this although the return of which it complained was far better than that of the petitioner in the instant case.

■ By our recent and unqualified refusal of the writ of error in City of Houston v. Southwestern Bell Tel. Co., supra, (152 Texas 656) we undoubtedly held that, with or without any review statute such as those involved in the gas and railroad rate decisions mentioned, the failure of telephone rates to produce a fair return on the fair value of the properties of the exchange in question was an enjoinable violation of constitutional guarantees, although there was no "confiscation" in the sense of an out-of-pocket loss.

Whether the City of Houston opinion be taken to refer only to the federal constitution or to both it and our state constitution, the result for most practical purposes is the same, and we see no good reason to distinguish between the two as to this largely academic concept of "confiscation" being distinct from "mere unreasonableness" in the matter of the return from public utility rates. Once we admit that the return of a given rate is so low that no reasonable or just man would require it and that he who suffers from it suffers beyond the limits of reason or justice, are we not overly metaphysical if we add that there is no constitutional question involved, or no right to judicial review without a statute, unless the rate actually produces red figures on a financial statement? Economic values exist largely in relation to other economic values. If the going rate for labor be $2 per hour, and a given laborer be prohibited by law from charging over 20 cents per hour, is he any the less a slave because he manages to subsist on his 20 cents?

No doubt it is the illusory nature of the difference between "confiscation" in terms of excess of outgo over income and "unreasonable" inadequacy of rates that has caused the federal courts to treat the two as identical for purposes of constitutional protection under the 14th amendment. See Nichols on Ruling Principles of Utility Regulation—Rate of Return, Chap. 2, Secs. 6-7. The federal cases cited in the City of Houston decision, supra, so hold, and we here hold likewise as to the federal constitution and the corresponding provisions of our state constitution.

A return of less than 2 per cent obviously qualifies as unreasonable under existing economic conditions of general knowledge as well as under the uncontested proof made at the hearing in this case.

It is also urged in support of the trial court's action (although the court itself did not make the point) that the petitioner failed in its proof of an inadequate return by failing to make some kind of division of its single exchange, or unit operation, financial picture into two complete pictures, as if two separate business enterprises were involved dealing respectively with "city" and "noncity" service or matters (whatever these latter terms might mean in detail as applied to the actual facts). We do not find this argument convincing.

Undoubtedly the single exchange system for the whole community has always been in actual use and there is no suggestion in the record that such a method of operation and accounting was followed in bad faith or in the least degree against the wishes of the City, or that it involved improper discrimination in any respect. Indeed, from every standpoint, a different system would have been as unnatural as it would doubtless have been unpopular. There is no statute directly or indirectly prescribing a different course. If the petitioner, with the object of facilitating future recourse to the city authorities for rate adjustments, had insisted upon a system of "long distance" service between neighbors on different sides of the city limits, the City itself would have been the first to complain, and with good reason.

■ This being so, it would seem to follow that in making a case of inadequacy of return, the petitioner would not in effect have to do for that purpose what it did not have to do and ought not to have done in the course of its actual operations, that is, to present some type of wholly theoretical and necessarily compli-

cated accounting "breakdown" of its single operation into two operations divided in some undefined fashion on a basis of city limit lines. If neither Art. 1119, supra, nor any other statute forbid, or by clear implication limit, the obviously preferable single exchange system for a single community, as is the case, then a reasonable inference is that the City, as the only regulatory body involved, or the court in reviewing the action of the City, should judge the rate of return by the same system.

This is especially true considering that, in the case of a community telephone exchange, any such financial "breakdown" on city lines would be considerably more theoretical and unnatural than in the case of most other kinds of community based business or public service. An electric, gas or water utility sells an easily measurable amount of electricity, gas or water to a particular customer at a particular place for his particular consumption, and at a particular price per kilowatt, cubic foot or gallon. Such a sale is thus localized, individualized and relatively tangible, however many other customers at other addresses the company may have. But the ability to transmit and receive communications throughout the exchange area, which is the commodity sold by a telephone company, simply does not lend itself to division or allocation by arbitrary lines through the area such as city limits. When city subscriber A talks to noncity subscriber Z, A is benefiting from, and in a true sense using, company property outside the city, including the very telephone in the hands of Z, even as the latter is simultaneously enjoying and using company property within the city. A and Z are each also enjoying the benefit of the company's existing contractual relations with the other. The more subscribers the company has outside the city limits the more valuable the service it sells to those within the City and vice versa.

These facts are admittedly recognized by the very ordinance in question, which contemplates that the rates thereby established for city resident include payment for exchange communications between the latter and noncity subscribers of the same exchange, regardless of whether the city subscriber is the caller or the called.

To find a sound and practical basis for splitting up for rate-making purposes such a naturally indivisible business enterprise into subunits somehow following city lines would seem almost impossible, even if the company witnesses had not testified that it was, as they did testify. How, for example, might one split the cost of a telephone instrument of the city physi-

cian which also serves noncity patients who happen to be his main clientele and call him at all hours, or the salary of the lineman who repairs both the city and noncity poles and wires that permit the calls of the city lawyer to his noncity clients, or the revenue received from a young lady city subscriber, who spends hours telephoning her friend just a block away across the city limit, or the cost of a noncity stretch of line to the farm of a noncity subscriber who talks occasionaly to other noncity subscribers but constantly to his city business connections for the benefit of the latter as well as himself?

Certainly the respondents have not undertaken to suggest how it might be properly done, and once we admit, as even the respondents do not deny, that the single community exchange flat rate system should be used as an admittedly legal and the most natural and convenient form of operation for all concerned, it would seem to follow that rates and returns should be determined upon the same basis.

No authority is cited to the contrary, but such authority as has been cited favors the view we take. In the Lone Star Gas Co. litigation, supra, involving the validity of an order of the Railroad Commission of Texas establishing Texas rates for gas produced and sold by an integrated utility with producing properties and pipe lines both in Texas and Oklahoma, the Supreme Court of the United States held, against the contention of the utility to the contrary, that the Commission properly considered the value of the properties in both states, and further held that, this being so, a reviewing court could not validly require the company to segregate the Oklahoma and Texas operations in order to demonstrate the Texas rates to be confiscatory. 304 U.S. 224, 551, 58 Sup. Ct. 883, 82 L.Ed. 1304.

In State ex rel. Clarkston Chamber of Commerce v. Department of Public Utilities, 34 Wash. 2d 141, 208 Pac. 2d 882, 884, while the exact question at issue was the more or less procedural one of whether the Washington rate-making body could validly hold a joint hearing in Idaho with the Idaho commission in order to fix telephone rates in two adjoining cities separated only by the state line, the court, in upholding the consequent order of the Washington commission, announced this proposition:

"The evidence taken as a whole makes it clear that it was much more practicable and in some aspects actually necessary to treat the project as one unit rather than two units, one

located wholly in Washington and the other in Idaho. Unless there exists some constitutional or statutory inhibition against such procedure it must be sustained by the courts."

In other words, even where the telephone exchange or operating unit is geographically divided between two sovereign states, each with its own appropriate regulatory body, as distinguished from the instant case of a city and mere adjoining suburban area, with no public rate-making authority having jurisdiction to make the rates charged suburban subscribers, the court still held that the community operation was a proper unit for rate-making purposes.

The foregoing decision, 34 Wash. 2d 141, 208 Pac. 2d 882, 885, incidentally quotes at length from a decision of the United States District Court for the Southern District of Indiana in Southern Indiana Tel. & Tel. Co. v. Public Service Commission, 1 P.U.R. (N.S.) 1934, 285, which involved a situation evidently quite similar to the present, the quotation being set in the footnote.[3]

In Logan City v. Public Utilities Commission of Utah, 77 Utah 442, 296 Pac. 1006, 1008, the Court, in dealing with an attack on the Commission's rate order for failure to separate the "rural lines" of an exchange similar to that here involved and to allocate them in some fashion to all of the cities of the state, gave as one of its reasons the character of the single community exchange as a natural unit for the service of both the urban and suburban subscribers.[4]

---

[3] "The evidence in this case fails to disclose any practical method by which the property of one of plaintiff's exchanges situated within the municipality can be separated from the exchange property in the surrounding rural district for rate-making purposes. All of the property of the exchange, both urban and rural, is connected by a common switch board and central plant, and none of the property within any one exchange territory can be separated from any of the other property within such exchange in such a manner as will permit the telephone utility properly to serve the public, for the reason, as above pointed out, that telephone service which is useful to the public necessarily means the transportation of messages between any two subscribers connected with the exchange, regardless of how widely separated, including both urban subscribers and rural subscribers within such territory. From the viewpoint of transportation of messages, there should be no arbitrary 'city limits' within the territory served by a single exchange. Both economically and socially the exchange territory is a unit, and neither the urban subscribers nor the rural subscribers would be satisfied with a telephone service unless they could communicate with each other at all times and from all points within the exchange district."

[4] "Moreover, the conclusion reached and announced by the commission on this particular subject is entirely sound and proper. The territory served by the rural lines is tributary to Logan as the commercial center. Their value to the business men of Logan is indicated by the fact that Logan people petitioned to have certain

The effect of Petition of Fryeburg Water Company, 99 N. H. 487, 115 Atl. 2d 420, is to recognize and approve the determination of water rates in a New Hampshire village upon a non-segregated basis where the water was furnished as part of a single system having reservoirs in both New Hampshire and Maine and serving also a nearby Maine village, absent factors of discrimination in favor of the latter. The court took occasion to characterize the alternative of a separate rate base for the New Hampshire village rates as "complicated, expensive and time consuming."

A substantial number of public utility commission decisions to the same general effect could also be cited, e. g., Re Mountain States Telephone & Telegraph Company, 2 P.U.R. 3d 123 (1934) ; Re New York Telephone Company, 84 P.U.R. (N.S.) 267; idem, 5 P.U.R. 3d 33 (1954).

Of course, the foregoing is not to say that where there is a question of whether rates charged in a given state or subdivision thereof burden interstate commerce, or where two competing regulatory bodies divide a single community between them, or perhaps where there is a question of rate discrimination, any attempt at separation of returns by character of commerce or geographical area is necessarily to be held improper or unnecessary, however theoretical and complicated the process may be. But the instant case is far from such a one.

■ A final and fundamental question is whether, regardless of all we have held up to this point, the refusal of the injunction is to be upheld on a general principle of discretionary authority of the trial court. That such a principle exists and makes a definite difference between cases of temporary and final injunction cannot be denied. Texas Foundries, Inc., v. International Moulders & Foundry Workers' Union, 151 Texas 239, 248 S.W. 2d 460, 463, and authorities therein cited.

However, this judicial rule by its very terms is one which can have clear meaning only as it has been actually applied to particular states of fact, and this is particularly so in the light of Art. 4662, Vernon's Texas Civ. Stats. Ann., which expressly, and in the broadest terms, guarantees the right of appellate

of these rural lines attached to that exchange and would undoubtedly protest if such lines were severed therefrom. Ordinarily the definition of an exchange area and determination of what rural lines shall be attached to a certain exchange are matters of business management and will not be interfered with by the commission in the absence of allegation and proof of bad faith or imprudence. There was no such showing here."

review of both the refusal and granting of temporary injunctions. Uusually, at least, the area of discretion is one involving either a matter of deciding the facts upon conflicting evidence or one of judgment about imponderables, such as future facts, or the balancing of equities.

In the Texas Foundries case we said the appellate court could not substitute its "judgment" for that of the trial court as to whether, in a case where violence had been practiced by the union, a modification allowing the union to continue to picket, but with requirement to do so only in a peaceful manner, "would result in future violence." And in Railroad Commission v. Shell Oil Co., 146 Texas 286, 206 S.W. 2d 235, relied on in the Foundries case, the area in question was one of fine lines between possibly irreparable injury to the oil companies and a probably valid but unprecedented order of the Railroad Commission.

We held in Southland Life Insurance Company v. Egan, 126 Texas 160, 86 S.W. 2d 722, 723, that "* * * the trial court's discretion is not unlimited and does not extend to the erroneous application of the law to undisputed facts."

The City of Houston and City of Baytown cases, both supra, upheld the action of the trial court on temporary injunction, but by our "refusal" of the writ of error in the former we adopted the rule of decision which it in turn had quoted from the latter, as follows [256 S.W. 2d 194]:

"A review of the decisions involving rates of public utilities shows that a temporary injunction will issue when three things are made to appear: (1) that there is a reasonable probability that the utility will succeed on final hearing, (2) that the loss to the utility resulting from a refusal to grant the temporary injunction will be irreparable, and (3) that the customers can be adequately protected by bond."

In the instant case, if we may go by the "Conclusions of Law" of the trial judge, any "discretion" exercised by him would have to consist of his two clearly erroneous holdings that (a) the rate and penalty ordinances somehow posed no threat that either would be enforced and (b) as a matter of law, the *status quo* was the ordinance rates under attack. But since he later refused to find that the ordinance rates would probably be adjudged confiscatory on final hearing and found their confiscatory character to be "a seriously debatable issue," we will discuss the case from that standpoint.

If it be true that this latter kind of holding would ordinarily fall within the realm of discretion, it is also true, and was in effect so "found," that injury to the petitioner was not only a serious possibility but, if existing, was irreparable, while, considering the proposed injunction bond, which was approved, there was no possibility of injury to the respondents or customers of the company under any circumstances. Any inconvenience to the customers in getting back overcharges could easily be handled by a provision in the final decree ordering the petitioner itself to make such refunds with appropriate accounting to the customer in each instance. The idea that a temporary writ would afford the petitioner all it might obtain by a permanent injunction fallaciously assumes that the petitioner would have no obligation to bring the case on for final hearing and that the respondents will supinely permit it to rest forever on its temporary laurels. Actually the bond itself would eventually become inadequate for the possible overcharges accumulating during pendency of the temporary writ.

More importantly, we think that the record leaves no room for a discretionary error as to the petitioner's chances of final success. The pleadings and testimony of the petitioner reflecting less than a 2 per cent return stand uncontradicted by even an affidavit. That small cities may not have funds wherewith to hire rate experts to rebut company experts cannot affect the matter. About the only attack on the testimony of the petitioner's witnesses was by way of cross examination in connection with the failure of the petitioner to segregate the exchange into urban and suburban divisions for rate-making purposes, a matter already dealt with. We are cited to no obvious inconsistencies or omissions in the company figures and have found none. There are no detailed findings or recitals of the trial court in this behalf. If we are to uphold his refusal of the injunction on the bare assumption that he might not have believed what the petitioner's affidavits and witnesses said, then virtually no refusal of a temporary injunction could be reversed on appeal, and the right granted by Art. 4662, supra, would be largely a dead letter.

It follows that the temporary injunction should have been granted as prayed for and that both courts below erred in holding otherwise. Their judgments are therefore reversed and the cause is remanded to the trial court for entry of judgment accordingly.

Opinion delivered October 3, 1956.

Rehearing overruled November 7, 1956.