**GENERAL TELEPHONE COMPANY OF the SOUTHWEST, Appellant,**

v.

**CITY OF GARLAND, Texas, et al., Appellees.**

**No. 18321.**

Court of Civil Appeals of Texas, Dallas.

April 25, 1974.

Rehearing Denied May 23, 1974.

------

Patrick E. Higginbotham, Coke & Coke, Dallas, for appellant.

Earl Luna, Luna, Murto & Sibley, Dallas, for appellees.

GUITTARD, Justice.

In this telephone-rate case, our principal question is whether a city may reasonably require the company to furnish information concerning the separate value of its property devoted to serving customers within the city as distinguished from its property serving all its customers within the metropolitan area. We hold that such information may be required in view of the trial court's finding, which we find to be supported by evidence, that the information could be furnished at reasonable cost.

Plaintiff General Telephone Company of the Southwest serves Garland and fifteen other municipalities in the Dallas metropolitan area. Southwestern Bell Telephone Company serves Dallas and other municipalities in the area. The two companies provide a flat-rate, toll-free service, termed "Dallas Metro Service," throughout the metropolitan area. The present controversy arises out of an application for a rate increase made by General to the Garland City Council. In support of this application General included in its rate base all its property used and useful in providing service to its subscribers in the metropolitan area, after excluding that portion allocated to long-distance service, and made no attempt to show separately that portion of its property used and useful for providing service to subscribers in Garland. The City requested information separated and allocated to the Garland local exchange. General advised the City that no further information would be furnished and requested the City to act on its application on the basis of the area-wide data. The City Council then adopted a resolution denying the rate increase. The resolution recited that the information furnished was insufficient to support the proposed rate increase and that General had failed to furnish the additional information requested. The resolution also provided that in the event General should file the information requested, additional public hearings would be held.

The present suit was filed by General for an injunction to restrain the City from enforcing the existing rate schedule and from interfering with its promulgation and charging of fair and reasonable rates. The City responded by a plea in abatement alleging that General had not exhausted its administrative remedies in seeking the rate increase in that it had not furnished information which the City had requested. After a protracted hearing the trial court sustained the plea in abatement and dismissed the suit. The court recited in its findings of fact that General had offered evidence showing that it had a rate base of more than seventy-seven million dollars for the sixteen cities it served in the area but had made no effort to determine what portion of that rate base was devoted to furnishing service to subscribers in Garland as distinguished from properties used in furnishing

service to subscribers in the fifteen other cities, and that General "could, at a reasonable cost, if it diligently attempted to do so, and should furnish to the City Council of the City of Garland the amount of the fair value of the property of the said General Telephone which is devoted to furnishing service to such city." The court found further that such information was necessary for the City to exercise its authority to establish telephone rates. General appeals.

The central problem in the case is that public utility services are most efficiently provided on an area-wide basis, but the only agencies of government authorized by Texas law to regulate their rates are the governing bodies of the separate municipalities, which have proliferated in metropolitan areas. Power to regulate rates of public utility companies enjoying franchises is conferred on cities by Tex.Rev.Civ. Stat.Ann. art. 1119, and art. 1175, § 12 (Vernon 1963), and is more particularly defined in Tex.Rev.Civ.Stat.Ann. art. 1124 (Vernon 1963), which provides that cities having the authority to regulate the rates of a corporation enjoying a franchise "shall, in determining, fixing and regulating such charges, fares or rates of compensation, base the same upon the fair value of the property of such . . . corporation devoted to furnishing service to such city, or the inhabitatnts thereof." Although General does not concede that the "Dallas Metro Service" is local service subject to the City's statutory power of regulation, it recognizes that the franchise under which it operates in Garland gives that City a contractual power to regulate rates charged Garland subscribers for the area-wide service to the same extent that the City has statutory power to regulate rates for local service. *Cf.* General Tel. Co. v. City of Littlefield, 498 S.W.2d 375 (Tex. Civ.App.—Amarillo 1973, writ ref'd n. r. e.).

We reserve to last the question of whether local regulation under the above statutes should be based on area-wide data, and we begin with General's second point of error, which asserts that the trial court "erred in sustaining the plea in abatement because Garland failed to sustain its burden of proving that the requests it made of General were practical and reasonable." This point is overruled. The only authority cited for casting this burden on the City is Flowers v. Steelcraft Corp., 406 S.W.2d 199 (Tex.1966), a case not involving public utility rates, in which the defendant was held to have the burden to prove the allegations in its plea in abatement. That decision sheds little light on our present problem. We recognize that a defendant has the general burden to establish the facts supporting a plea in abatement, but our question is whether reasonableness of the request is a part of the prima facie case which the City must present in support of its plea. We hold that reasonableness was not essential to the City's prima facie case, but rather that General had the burden to establish unreasonableness under the general principle that the action of a municipal governing body is presumed to be valid and the party attacking such action has the burden to show it to be arbitrary and unreasonable. Town of Ascarate v. Villalobos, 148 Tex. 254, 223 S.W.2d 945, 950 (1949); Bexar County v. City of San Antonio, 352 S.W.2d 905 (Tex.Civ. App.—San Antonio 1961, writ dism'd). That principle applies here with peculiar force, since General was obviously in a better position than the City to supply information concerning its business and property and other matters affecting reasonableness of the City's request. The City proved that it had requested additional information as a basis for considering General's application for a rate increase, that General had failed to furnish the additional information requested, and that the City Council had denied the increase because of such failure, but had offered to hold further hearings in the event such information was furnished. This evidence established prima facie that General had failed to exhaust its administrative remedy of presenting additional information to the

City Council in support of its application for a rate increase. Southwestern Associated Tel. Co. v. City of Dalhart, 254 S. W.2d 819, 825 (Tex.Civ.App.—Amarillo 1952, writ ref'd n. r. e.). The burden then shifted to General to establish that the City's request was arbitrary and unreasonable.

■ The question of reasonableness of the City's request is raised in other points of error. General's third point asserts that the trial court erred in concluding as a matter of law that General failed to exhaust its administrative remedies in that it failed to provide the data requested by the City in support of its application. Whether failure to furnish the data was a failure to exhaust General's administrative remedies depends on whether the City's request for the additional data was reasonable. This question depends on the propriety of the trial court's fact finding that General could have furnished such data at reasonable cost. The fourth point complains that there is no evidence to support this finding, and the fifth point complains that it was against the overwhelming weight and preponderance of the evidence.

■ Our review of the record has revealed ample evidence to support the finding. General's evidence tends to show that according to rate-making practices in the industry, properties devoted to local service are separated from other properties on a usage basis and that the ability to retrieve data necessary to measure the relative usage of the common equipment by subscribers within the respective municipal boundaries was lost when the "Metro Service" was inaugurated. According to General's witnesses, it has no records from which such separated usage data can be supplied and it cannot furnish such data without employing substantially the same type of equipment as that used for establishing toll charges for long distance calls, and installation of such equipment would require an expenditure of fifty million dollars, an amount that would clearly be un-

reasonable if it served no purpose other than to provide information for rate regulation. General's witnesses explained that calls routed from Garland through Southwestern Bell's area were handled by Bell's highly efficient "tandem switch," which made retrieval of any information concerning destinations impossible, and consequently, there was no way to determine whether such calls were destined for Bell's area or other exchanges in the municipalities served by General. These witnesses provided little information on whether a less accurate method of measuring or estimating usage would be available without equipment capable of tracing each call, and said only that they knew of no means to measure such uses with reasonable accuracy. They admitted that General's traffic department had "scanners for usage" and other equipment which provided traffic data for other purposes, such as determining the need for additional trunk lines, but they did not comment on whether this equipment could produce information that would be helpful in estimating proportionate usage by Garland subscribers of the common equipment.

The City's experts did not agree that General had no practicable method of furnishing separate usage data and gave their opinion that such a separation was feasible and reasonably necessary for rate-making purposes, but they presented no specific procedure for obtaining such data. They said that data for rate regulation did not need to be as accurate as would be provided by equipment capable of tracing each individual call. One of the techniques they suggested for such an approximate allocation was sampling, although they could not specify how that technique would be employed in this case. They explained that any method of estimating separated usage involved expense and that more accurate data would involve greater expense, so that the question boiled down to whether the cost of regulation based on separated usage data was economically justified. In their opinion a less expensive but less accurate method of obtaining such data could be

worked out that would be acceptable to the City, and they estimated that an allocation with ninety-five percent accuracy could be made by use of sampling techniques and available traffic data. They suggested that they would need to know what usage and traffic information was available to General and what it would cost to provide such data before they could determine the degree of accuracy of the information that the City could reasonably require General to furnish, but that General had not furnished enough information for them to make that determination. In their opinion, such an approximate allocation would be a fairer basis for rate making than the value of all General's property in the sixteen cities it served. They pointed out that the interchange agreement between General and Southwestern Bell required General to furnish an allocation of costs as a basis for monthly settlements between the two companies and thus indicated that techniques existed for gathering some sort of usage data without the more elaborate equipment discussed by General's witnesses.

Members of the Garland City Council testified that General's President Beck told them in a meeting that General could work out with the City and its technical advisers a method of providing separated data within sixty to ninety days, but that Beck insisted that the rate increase be put into effect before such an effort was undertaken. Beck testified at the hearing of the plea in abatement that he had told the City's representatives that there was no existing procedure available and that four to six months would be required to develop a procedure that General could live with, but that General would want the agreement of all the cities involved. This testimony also indicates that General could have furnished the data requested without equipment capable of tracing each individual call.

Since we hold that General had the burden to show that the City's request for information was unreasonable and arbitrary, but presented no evidence concerning any available usage or traffic information and relied altogether on its inability to trace and account for each call destined for a receiver outside Garland, the trial judge was justified in adopting the conclusion of the City's experts that less accurate but useful information could be furnished at reasonable cost. Even if the burden rested on the City to show that its request was not unreasonable, we conclude that evidence sufficient to support the court's finding is provided by the opinions of the City's experts, based on their experience and general knowledge, that some sort of approximation of the separate usage and traffic attributable to Garland subscribers could be presented which would be fair for rate-making purposes both to General and to its subscribers in Garland. Inability of these experts to define exact procedures for obtaining such information did not leave their opinions completely without probative force. Consequently, General's third, fourth, and fifth points are overruled.

We turn now to General's first point, which asserts that the court erred in finding that Garland had not been furnished data upon which the City Council may properly set rates for telephone service in Garland. Under this point General argues that no separation was required because the information furnished concerning all its properties and operating expenses within the Dallas metropolitan area was sufficient for the purpose of rate making by each of the cities it serves, including Garland. In support of this argument, General cites General Telephone Co. v. City of Wellington, 156 Tex. 238, 294 S.W.2d 385 (1956). That case holds that no separation was required as between values of property used in serving a regulating municipality and those used in serving the surrounding rural area, where all subscribers were served through a single exchange. The court said that the single-community flat-rate system was proper, regardless of city lines, since toll charges on all calls outside the city would be unacceptable to subscribers both within and without the city, and

that any financial "breakdown" on city lines would be theoretical and unnatural. The court observed that it was almost impossible to find a sound and practical basis for splitting up for rate-making purposes one naturally indivisible business enterprise into subunits following city lines. Recognizing that its opinion would have implications for extended flat-rate service covering neighboring municipalities, the court was careful to avoid such implications by expressly disavowing any holding that where two competing regulatory bodies divide a single community between them, any attempt at separation by geographical area was necessarily improper or unnecessary, however theoretical and complicated the process might be. The court pointed out that the case under consideration was far from such a case.

We conclude that the implications of *Wellington* should not be extended to a case involving service within several regulating municipalities. Under Texas law no authority exists for regulating rates of telephone service in rural areas, but to charge different rates to customers within and without city lines in such a case as *Wellington* would raise questions of unreasonableness and discrimination. City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622, 626 (1952). The situation is different where extended service is provided to several regulating municipalities. Each is properly concerned about the interests of its citizens and no problem exists concerning discrimination against subscribers in an unregulated area. The propriety of requiring separated usage data in this context is a matter of reasonableness in view of the regulatory powers of the different municipalities involved. One factor affecting reasonableness is the cost of providing the separated data, and another is the relative accuracy of data available at reasonable cost. These factors were apparently not raised or considered in *Wellington*, but they are of crucial importance here, and for the reasons already given we hold that they presented fact questions for the trial court.

■ The *Wellington* opinion cites State ex rel. Clarkston Chamber of Commerce v. Department of Public Utilities, 34 Wash.2d 141, 208 P.2d 882 (1949) for its holding that even where the telephone exchange or operating unit is geographically divided between two states, each with its own regulatory body, the community-wide operation on both sides of the state line was a proper unit for rate-making. That case did not hold, however, that the community-wide operation was the only proper unit for rate-regulatory purposes, regardless of the regulatory bodies involved. We do not hold here that Garland could not legally have based its rate ordinance on the area-wide data furnished by General rather than on separated data concerning usage of the common property by Garland subscribers. We hold only that Garland's choice to regulate the rates charged to telephone subscribers within its borders on the basis of the fair value of properties devoted to furnishing that service, separated on a usage basis from the properties devoted to serving General's other subscribers, was a choice within the discretion of the Garland City Council in absence of proof that such a choice was unreasonable and arbitrary.

■ We recognize the force of General's argument that to furnish separated data useful for no purpose other than regulation would be uneconomic, and that the principle of equal rates for equal service would more likely be realized within the metropolitan area if the same area-wide figures were used for rate regulation by each of the sixteen municipalities where General operates. These problems, however, are inherent in the Texas statutory scheme of rate regulation by local authorities as applied in metropolitan areas. Under that scheme, if the subscribers in one municipality are less habituated to telephone communication than subscribers in other municipalities in the area, they should be charged a relatively smaller portion of the common expense of providing the service. Whether the cost of the additional data necessary for city-by-city regu-

lation is economically justified is a matter of reasonableness for determination by the respective governing bodies. The additional cost would be an expense to be included in the rates. Driscoll v. Edison Light & Power Co., 307 U.S. 104, 120, 59 S.Ct. 715, 83 L.Ed. 1134 (1939) ; West Ohio Gas Co. v. Public Utilities Comm'n, 294 U.S. 63, 73, 55 S.Ct. 316, 79 L.Ed. 761 (1935). Moreover, uniformity of rates in the metropolitan area would not necessarily be achieved, even if all sixteen of the municipalities served by General should decide to accept area-wide data as the basis for their regulation of rates, since each governing body would have authority to make its own evaluation of that data and also to employ experts to gather additional information. Regulation of public utility rates by each of several municipalities in the same metropolitan area may well result in increased costs and less uniformity than regulation by a statewide agency, but the remedy for these problems lies with the legislature rather than with the courts. Consequently, General's first point is also overruled.

Affirmed.