**CRESTVIEW, LTD., Appellant,**

v.

**FOREMOST INSURANCE COMPANY, Appellee.**

**No. 13461.**

Court of Civil Appeals of Texas, Austin.

July 29, 1981.

Rehearing Denied Oct. 7, 1981.

David L. Orr, McGinnis, Lochridge & Kilgore, Austin, for appellant.

Robert J. Hearon, Jr., R. Clarke Heidrick, Jr., Graves, Dougherty, Hearon, Moody & Garwood, Austin, for appellee.

POWERS, Justice.

This appeal is taken from the trial court's denial of a temporary injunction. Appellant, Crestview, Ltd., purchased an office building encumbered by the lien of a recorded deed of trust. The deed of trust secured a promissory note made by Crestview's grantor and held by appellee, Foremost Insurance Company.[1] The deed of trust contained this agreement:

> "In the event Grantors, or any owner of the Mortgaged Premises, without first obtaining approval of Noteholder (which approval shall not be unreasonably withheld), should sell or otherwise dispose of the Mortgaged Premises, or any part thereof, at any time before this Deed of Trust is fully released and discharged, Noteholder shall have the option to declare the indebtedness hereby secured due and payable...."

We will refer to this provision as the "due on sale clause."[2]

Though requested to do so, Foremost never approved the sale of the property to Crestview. Foremost did, during the negotiations which preceded to the sale, offer to approve the sale in return for either a reduction in principal or a change in the interest rate to a higher rate than that provided in the promissory note it held. No agreement was reached in this regard.

Despite the fact that Foremost had not approved the sale, and knowing that fact, Crestview purchased the property. On being notified of the sale, Foremost immediately declared the installment debt due and payable and requested the trustee to sell the property when payment was not forthcoming from the maker, Crestview's grantor. The basis for such acceleration was, of course, the "due on sale clause."

Crestview filed suit in a Travis County district court before the trustee's sale, alleging that Foremost had unreasonably withheld its approval, had acted inequitably, unjustly and oppressively in accelerating the debt, and that the "due on sale clause" was an unreasonable restraint on alienation of property. Based upon these allegations, Crestview requested the trial court's declaratory judgment that the accelerated debt was invalid as a basis for the trustee's sale; and, requested temporary and permanent injunctive relief aimed at preventing the trustee's sale of the property to satisfy the debt. The trial court denied the application for temporary injunction and from that order of denial Crestview appealed to this Court. Ancillary to that appeal, we granted a temporary injunction, on Crestview's application, for the purpose of preserving our jurisdiction pending appellate review. *Crestview, Ltd. v. Foremost Insurance Company*, No. 13,451 (Tex. Civ.App.—Austin, February 27, 1981).

Having now considered the interlocutory appeal taken by Crestview from the trial court's denial of temporary injunction, we

---

1. The maker of the note was Crestview Company, a partnership. Crestview Company had purchased the property from Foremost, paying a large part of the purchase price by execution and delivery of its promissory note, secured by a deed of trust lien. This note and deed of trust are those in controversy in this suit.

   Several months after acquiring the property, Crestview Company sold and conveyed the property to appellant, Crestview, Ltd., a limited partnership. In taking conveyance of the property, Crestview, Ltd., did not "assume" the indebtedness owed to Foremost but merely took title "subject to" the lien which secured the debt. There is no organizational relationship between Crestview Company and Crestview, Ltd.

2. The term "due on sale clause" has evolved in the legal literature to describe such acceleration clauses generally. The parties have used the term to describe the clause quoted above, which plainly gives the noteholder the right to elect to accelerate the installment debt if the property is sold without his approval. The term is therefore somewhat of a misnomer, for the debt is not due and payable automatically on a sale of the property, but on the noteholder's election that it be accelerated.

affirm the order of the trial court and dissolve the injunction issued earlier by this Court.

## STANDARD FOR APPELLATE REVIEW

Crestview contends initially that the standard for our review is whether it presented in the trial court a *prima facie* case entitling it to a temporary injunction, rather than the more common standard of whether the trial court abused its discretion in refusing such relief. Crestview bases this contention upon the proposition that Tex.Rev.Civ.Stat.Ann. art. 4642, § 4 applies to "any threatened irreparable injury to real estate," within which phrase Crestview would include a sale by trustee under a power granted in a deed of trust.[3] We disagree with this interpretation of that statutory provision.

■ Section 4 of Article 4642 is not ambiguous and is written narrowly to apply in only two kinds of circumstances, in contrast to the more general circumstances referred to in the preceding sections of the statute, manifesting a legislative intention that Section 4 be applied *literally*. *Brazos River Authority v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99 (1961). The two kinds of circumstances specifically contemplated by Section 4 are not applicable in the present case, there being no threatened sale under writ of execution directed against a party having no interest in the property, nor any threatened injury to property. Crestview's complaint is one of threatened injury to its title and possession, and not one of injury to the property itself. We hold, then, that the standard for appellate review is the ordinary standard of whether the trial court abused its discretion in denying the temporary injunction. *Brooks v. Expo Chemical*

*Co.*, 576 S.W.2d 369 (Tex.1979); *Camp v. Shannon*, 162 Tex. 515, 348 S.W.2d 517 (1961); *Davis v. Huey*, 571 S.W.2d 859 (Tex. 1978).

## ABUSE OF DISCRETION BY THE TRIAL COURT IN REFUSING TO GRANT A TEMPORARY INJUNCTION

Crestview contends that even under the ordinary standard for appellate review, we must reverse the trial court's order because the court abused its discretion in that it applied the law erroneously to the undisputed facts. It did so, according to Crestview, by assigning an erroneous meaning to the "due on sale clause," a meaning which permitted Foremost to withhold its approval on any basis considered reasonable in light of all the circumstances.

Each party to this appeal cites a general line of cases in support of the meaning it would give to the "due on sale clause."

The cases cited by Crestview generally state or assume that a "due on sale clause," like all other provisions in a mortgage instrument, has the purpose of protecting the noteholder's security, and unless the unapproved transfer has posed a risk to that security, the right of acceleration will not be enforced. These cases hold generally that unless the clause is so restricted, it amounts to an unreasonable restraint on alienation; or, that equity ought to prevent enforcement of the right of acceleration when it is not exercised to accomplish the only purpose for which the clause was included in the mortgage instrument, acceleration for any other reason being unreasonable, unjust, inequitable or oppressive. These cases do not, however, hold the clause to be invalid *per se*, either on equitable grounds or because it is a restraint on alien-

---

3. The section provides that injunctions may issue:

"4. Where a cloud would be put on the title of real estate being sold under an execution against a party having no interest in such real estate subject to the execution at the time of the sale, or irreparable injury to real estate or personal property is threatened, irrespective of any legal remedy at law."

It has been held that the standard of review on appeal, in cases involving sales *under writs of execution*, is whether the applicant for temporary injunction made such a showing in the trial court "as would constitute a prima facie case upon a trial on the merits." *Weart v. Mahone*, 176 S.W.2d 197, 202 (Tex.Civ.App.—Galveston 1943, no writ).

ation. The advocates of this point of view tend, rather transparently, to make the result turn on the status of the parties rather than on the terms of their contract and the established rules for interpreting and enforcing contracts. *See, e. g.' Wellenkamp v. Bank of America*, 148 Cal.Rptr. 379, 582 P.2d 970 (1978); Comment, "Judicial Treatment of the Due-On-Sale Clause: The Case for Adopting Standards of Reasonableness and Unconscionability," 27 Stan.L.Rev. 1109 (1975).

The cases cited by Foremost, in support of the trial court's enforcement of the clause, generally uphold enforcement on a theory that it does not amount *per se* to an unreasonable restraint on alienation, and is therefore enforceable, often saying in addition that the clause should be enforced as written and agreed upon by competent parties, the court having neither the power nor the inclination to impose upon them a different bargain and agreement. These decisions permit the creditor's desire to increase the interest rate, or diminish his principal at the low rate, to serve as a basis for acceleration. They do not, however, rule out relieving a mortgagor from bad faith, unconscionable or inequitable conduct in a particular case. *Mutual Federal Sav. & Loan Ass'n v. Wisconsin Wire Works*, 58 Wis.2d 99, 205 N.W.2d 762 (1973); *Baker v. Loves Park Savings & Loan Ass'n*, 61 Ill.2d 119, 333 N.E.2d 1 (1975); *Crockett v. First Federal Savings & Loan Ass'n*, 289 N.C. 620, 224 S.E.2d 580 (1976); *Enforcement of Due-On Transfer Clauses*, 13 Real Prop. Prob. & Tr. J. 891 (1978). See also Annot. 69 A.L. R.3d 713 for an analysis of the cases in both lines of authority.

### THE MEANING TO BE ASSIGNED TO THE PRESENT "DUE ON SALE CLAUSE"

The promissory note and deed of trust at issue in this case originated in Foremost's sale of the property to Crestview's grantor. In that transaction, the parties agreed that a large part of the purchase price would be deferred in its payment while bearing interest at a rate fixed in the note. These were two of many interdependent elements of the entire bargain reflected in the note and deed of trust. Another such element was that particular agreement we have named the "due on sale clause," by which the parties agreed concerning their rights and obligations in a future circumstance, a sale of the property by the mortgagor at a time before the debt was paid.

The "due on sale clause" is broad but not ambiguous. There can be no reasonable doubt of its intended meaning. Its very breadth is an indication of the generality of its intended effect—to require the noteholder's approval *in the case of any sale*, or to permit him to terminate prematurely the deferred-payment arrangement if his approval is not obtained. The right of acceleration which arises in the noteholder, if the property is sold without his approval, is in this instance clear and unequivocal. Such clauses have heretofore been enforced precisely as written. *A. R. Clark Investment Co. v. Green*, 375 S.W.2d 425 (Tex. 1964).

The wording of the clause is singularly inapt to express a contractual intention that it be narrowly limited in its effect to one particular circumstance, that is, where a sale by the owner threatens to impair the security of the debt, and ineffective or inapplicable with respect to all other sales. The contracting parties expressly provided, and therefore intended, that Foremost have the contract right to re-examine the deferred-payment arrangement in its entirety, *on any sale* of the property, to withhold its consent to the sale on any reasonable basis, and to accelerate the installment debt if the owner sold the property without Foremost's approval. We believe this interpretation is compelled by the very language used in the clause. The legal issue is thus narrowed to whether the clause should be circumscribed on equitable or public policy grounds *notwithstanding* the contractual intent clearly expressed thereby.

A number of the cases relied upon by Crestview state an initial premise or assumption that the sole purpose of any provision in a mortgage instrument is to protect

the noteholder's security. From this, these cases reason that unless the transfer of title will pose a risk to that security, the "due on sale clause" will not be enforced.

■ If a "due on sale clause" is ambiguous in its meaning, its being found in a security instrument such as a deed of trust, would, indeed, justify an assumption that security for the debt was the parties' object and purpose. This assumption would be a valuable interpretative aid in ascertaining the parties' intention in a particular circumstance when enforcement of the clause is sought or resisted. On the other hand, if the clause is *not* ambiguous, as in the present case, there is no reason why it should not be enforced, between the immediate parties and those having notice of it, according to the exact terms and conditions that the parties have chosen to use in creating and measuring their contractual rights. *Murchison v. Freeman*, 127 S.W.2d 369 (Tex.Civ.App.—El Paso 1939, writ ref'd).

■ The ancient and dominant purpose of a mortgage instrument is obviously that of securing the mortgagor's debt. There is, however, no intrinsic illegality in attaching to the mortgage agreement other special stipulations or agreements unrelated to the matter of debt security. These stipulations or agreements are, of course, subject to public policy limitations.[4] Mortgage provisions which allow prepayment of the whole or a part of the debt, and partial-release provisions, are examples of such special stipulations or agreements. In the particular deed of trust now before us, we find several such special stipulations and agreements. Among the most onerous, from the standpoint of the noteholder, is his agreement that he will not seek to enforce against the maker of the note any "personal or corporate liability" for payment of the

debt or interest, or for performance of any covenant or agreement contained in the deed of trust or any other instrument which secures the debt. The same provision stipulates that the noteholder may not seek a deficiency judgment against the maker and that the noteholder's sole recourse shall be against the property described in the deed of trust. *See R & P Enterprises v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517 (Tex. 1980); *Le Boeuf v. Davis*, 306 S.W.2d 185 (Tex.Civ.App.—Amarillo 1957, no writ); 39 Tex.Jur.2d *Mortgages and Trust Deeds* § 207, p. 269.

Therefore, rather than assuming that the "due on sale clause" must have been inserted in the deed of trust only to protect the noteholder's security, it seems plain that we cannot ignore the fact that there is an equal likelihood that it might have been bargained for and included for other purposes as well. For example, it could have been included so as to permit the noteholder to prevent a sale of the property insofar as it would obligate him to continue in force an interest obligation measured by a rate lower than a rate being charged at the time of the sale in mortgage loans of a similar kind. This is, of course, the primary purpose of such a clause. Volkmer, *The Application of the Restraints on Alienation Doctrine to Real Property Security Interests*, 58 Iowa L.Rev. 747, 769 (1973). Another reason for including such a separate stipulation or agreement might have been the parties' fear of impairing the note's attribute of negotiability, or of losing the agreement entirely by operation of the rule of merger, unless it be included in the deed of trust rather than in some other document.[5] We will not, then, assume that the unambiguous "due on sale clause" now before us necessarily has only a limited scope merely because it is found in a security instrument.

4. The primary public policy involved is that which prohibits any provision which may "clog" the mortgagor's "equity" of redemption; thus, he may not simply waive his right of redemption or otherwise agree to frustrate its exercise. 9 Thompson, *Real Property*, § 4668, pp. 66–68.

5. We need not determine in this case, of course, whether such a fear is justifiable under the modern law of negotiable instruments. *See* Bailey, *Negotiable Instruments and Contemporaneously Executed Written Contracts*, 14 Texas L.Rev. 307, 308, 314 (1936); Tex.Bus. & Com.Code Ann. § 1.102(c) and the comment thereunder; §§ 1.208, 3.104(a)(2), 3.104(a)(3), 3.105(a)(3) and 3.109(a)(4).

What then is the reasonable meaning to be assigned to the "due on sale clause" as it is written in this case? There was included in the promissory note a parallel provision which allowed the maker to benefit by a change in economic or personal circumstances, just as the noteholder could benefit from the "due on sale clause." The note authorized the maker to prepay the debt in whole or in part, without penalty, at any future time within the term of the note. This prepayment provision and the "due on sale clause" were manifestly designed and intended to allow either party to terminate the deferred-payment arrangement when it became advantageous to do so, the noteholder's right being somewhat more limited because it could arise only when the owner sought to sell the property.

It necessarily follows that when it became advantageous for one party to terminate the deferred-payment arrangement, his doing so would conclude a corollary advantage theretofore enjoyed by the other party, an advantage which would have been preserved and continued by maintaining in force the original deferred-payment arrangement. At the time of contracting, each party hoped, no doubt, that future circumstances and the action or inaction of the other would work to his advantage and not his disadvantage. Nevertheless, these contractual provisions are not rendered voidable on equitable or public policy grounds *merely because* one party is disappointed with the course of economic events and with the course of action taken by the other party in making the election that he is expressly allowed to make under the provisions of the contract. These are the very things about which the parties contracted and the risk they expressly assumed in giving the other a right to terminate the deferred-payment arrangement. *City of Austin v. Cotten*, 509 S.W.2d 554 (Tex. 1974). Something more is required before such an agreement may be set aside by the courts, and to this we now turn.

### LIMITATION OF THE "DUE ON SALE CLAUSE" ON EQUITABLE GROUNDS

■ Crestview has not alleged fraud, mistake, accident or any other basis for reformation of the "due on sale clause." It seeks rather to "reform" the clause indirectly by prohibiting its enforcement except in cases where the noteholder's security is threatened. We see no basis for the interposition of equity when, as here, a contracting party has agreed to an unambiguous contract provision, of which Crestview had notice, and there is no allegation that the wording of that provision does not accurately reflect the contracting party's intention at the time the contract was made, no matter that it may, in its broad scope, work to his disadvantage due to a change in economic conditions since its execution.

> "It is not the province of equity to change the contract of a party, and relieve him from an obligation fairly undertaken, especially after he has received the consideration which induced him to assume it. It can compel execution of agreements but not substitute one agreement for another."

*Trevino v. Cantu*, 61 Tex. 88 (1884). We hold, then, that the trial court did not err in construing the "due on sale clause" to allow Foremost to consider all of the circumstances in deciding whether to consent to the sale of the property to Crestview. Crestview failed to allege and prove any basis for reformation of the contract and the trial court properly interpreted the clause to give effect to the intention of the contracting parties, as manifested objectively in the clear and unambiguous language they selected to express their intention. *A. R. Clark Investment Co. v. Green, supra.* While the *Green* case deals with the same clause in a *chattel* mortgage, this distinction is immaterial insofar as Crestview complains of Foremost's *conduct* under the "due on sale clause." Crestview's complaint that the clause constitutes an unreasonable restraint on alienation is discussed *infra*.

■ Did the evidence support the trial court's finding that Foremost was not unreasonable in withholding its approval of the sale to Crestview? The evidence adduced at the hearing on temporary injunc-

tion was conflicting as to the extent that Foremost relied upon credit worthiness and managerial skill in considering whether to approve the sale to Crestview. It is undisputed, however, that before Crestview purchased the property, it knew that Foremost would not approve the sale unless the interest rate was raised from 9.5% to 12.0% or $400,000 was prepaid on the principal sum of the debt. The trial court necessarily found that Foremost's conditioning its approval upon an increase in the interest rate or a prepayment of this magnitude did not render Foremost's conduct unreasonable, unjust, inequitable and oppressive, "considering all of the facts and circumstances as viewed [by Foremost] with the facts it had at the time it made its decision." The "due on sale clause" being lawful as written, and sufficient in its wording to permit a consideration by Foremost of whether it would be better served by terminating the deferred-payment arrangement at the old interest rate, the evidence was insufficient to establish unreasonable, inequitable, unjust or oppressive conduct on the part of Foremost, and did not justify the interposition of equity. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951); *Crockett v. First Federal Sav. & Loan Ass'n, supra*. Had the course of economic events taken another turn, Foremost would not have been heard to complain that Crestview had determined to seize the advantage of lower interest rates and to prepay without penalty its promissory note, as it was clearly entitled to do under the parties' agreement.

### THE "DUE ON SALE CLAUSE" AS AN UNREASONABLE RESTRAINT ON ALIENATION

■ We turn then to Crestview's more difficult contention that the "due on sale clause" is void as an unreasonable restraint on alienation if it is construed to allow a noteholder to accelerate the installment debt, following a sale of the property to which it has not consented, on any basis apart from a risk that his security will be impaired by the sale, however reasonable that basis may be.

The "restraint" in such a case is indirect only, and consists in the inhibiting effect such a clause has with respect to prospective purchasers and the owner, who may be compelled either to forego a contemplated purchase and sale or arrange for immediate payment of a large sum of money, previously payable in installments over an extended period of time. In practical effect, the inhibition is much like that which results from the existence of any statutory or consensual lien against property sought to be sold, except for the contingency of whether the noteholder will accelerate the debt or not. There is not, of course, any direct restraint against alienation imposed by the "due on sale clause" or any other part of the deed of trust. The asserted "restraint" exists in the threat of acceleration.

The matter of whether the clause is an unreasonable restraint on alienation involves not the intention of the parties to a contract, or their justifiable expectations thereunder, but the ascertainment and implementation of the broad public policies which justify the common-law rule that prohibits such restraints.[6] Without question, the rule against such restraints conflicts with a contrasting public policy which favors allowing an owner of property to sell and convey his property subject to such qualifications as he may choose to impose in agreement with his purchaser, which may include a "due on sale clause," as it did in this case, to facilitate the sale.

As mentioned above, the various state jurisdictions are divided whether a "due on

---

6. "The underlying principle which operates throughout the field of property law is that freedom to alienate property interests which one may own is essential to the welfare of society. The basis for the assumption that social welfare requires freedom of alienation ... rests in part upon the necessity of maintaining a society controlled primarily by its living members, in part upon the social desirability of facilitating the utilization of wealth, and in part upon the social desirability of keeping property responsive to the current exigencies of its current beneficial owners." Restatement of Property, Introductory Note, Restraints on Alienation, 2379–80.

sale clause" is an unreasonable restraint if construed to allow acceleration following a sale from which the withholder has withheld his approval on some reasonable ground apart from a threat to the debt's security.[7] The issue is made difficult of resolution primarily because of the provisions of the Restatement of Property, discussed below.

We note in the beginning that it is incongruous that a "due on sale clause" of the kind here in issue is attacked on the ground that it inhibits alienation and frustrates the public policies favoring the free alienation of property, for the clause normally arises as part of an agreement wherein the maker and payee of a note have agreed to defer payment of a large part of the purchase price of a parcel of property *in order to accomplish its alienation*. Such a financial arrangement operates intrinsically to facilitate, and not inhibit, the free alienation of real property and acts directly to serve the public policies relied upon to justify in the first instance the rule against unreasonable restraints. In contrast, if a "due on sale clause" may lawfully operate only when the noteholder's security would be impaired, we should think that the result would be to deter sellers and lenders from committing themselves to long-term, deferred-payment arrangements with purchasers, except at higher rates of interest, higher purchase prices, or higher initial cash payments, all of which would tend to discourage the sale and alienation of real property, thereby subverting the pertinent public policies sought to be served by the rule against unreasonable restraints.

This incongruity suggests, of course, that a "due on sale clause" limited only by an express or implied requirement of reasonable conduct on the part of the noteholder is perhaps not in law an unreasonable restraint on alienation, for in its operation it bears no relationship to the evils which the rule was designed to prevent. *Mattern v. Herzog*, 367 S.W.2d 312 (Tex.1963); Restatement of Property, § 406, comment.[8]

---

7. It would appear that an indirect restraint on alienation must result under both lines of authority. In those jurisdictions which limit enforceability of a "due on sale clause" to those situations where the *debt's* security is threatened by a proposed transfer, the uncertainty or dispute about *whether* the debt's security will in fact be impaired in a particular case produces an inhibiting effect of its own. It seems anomalous, then, to call forth the public policies against restraints as a justification for so limiting the enforceability of the clause. On the other hand, the same or a similar inhibiting effect must result in those jurisdictions which enforce the clause if the noteholder claims any reasonable basis for withholding his approval of a transfer.

A case-by-case evaluation of the applicable circumstances is unavoidable under any approach, unless it be held that a "due on sale clause" is repugnant to the owner's fee simple title and is therefore void *per se*. Very few jurisdictions have so held, preferring instead to formulate rules or sets or circumstances which allow or not enforcement of the clause. *See* Volkmer, *supra*, 752–3. The necessity for a case-by-case evaluation produces, of course, the secondary inhibiting effect.

8. The comment provides that, as a general rule, restraints upon alienation will be upheld when the objective accomplished by imposing the restraint is of sufficient social importance to outweigh the evils which flow from so interfering with the power of alienation, or the curtailment of the power of alienation is so slight that no social danger arises. Who then is best informed and able to cast the balance to ascertain the paramount public interest and to provide how it shall be implemented? It must be remembered that there are numerous public interests involved in considering the permissible scope of a "due on sale clause": the stability of land titles, the freedom to contract, the availability of credit opportunities, the prevention of abuses made possible by superior knowledge or bargaining power, the protection of individual home ownership and the resulting large investment, the practical difficulty of proving impairment of a security interest, and so forth.

"It is submitted that the proper province for dealing with the due-on clause is that of the legislative branch of government, and not the judicial, particularly since the issue is often discussed by the courts in terms of 'public policy.' . . .

"The due-on cases, in their brief history, represent a valuable study in our changing legal system, moving from cases decided in the mid-sixties and early seventies strictly adhering to provisions of contract, regardless of the positions of contracting parties, to the ultimate disregard of contract [and established contract law] . . ." *Enforcement of Due-On-Transfer Clauses*, *supra*, at 935.

The definitions and the rules of the Restatement of Property are of little help in ascertaining whether the "due on sale clause" is, in law, an impermissible restraint on alienation of real property. The pertinent provisions do not clearly fit the situation where such a clause is attacked on the basis of its inhibiting effect against sales. *Enforcement of Due-On-Transfer Clauses, supra*, at 901. Nevertheless, the broad language used in the Restatement, coupled with its declaration that *all* restraints are invalid unless they meet the qualifications stated therein, require that we analyze the clause in the framework of the Restatement.

For the purposes of the present case, the Restatement defines a "restraint on alienation" as an attempt by contract (the "due on sale clause" here) to impose a "contractual liability" upon a contracting party who conveys real property in "breach of an agreement" not to do so. Restatement of Property, § 404. Section 404 characterizes this kind of restraint as a "promissory restraint," based upon the proposition apparently, that it arises from the grantor's qualified or unqualified promise not to convey the property, coupled with the inhibiting effect of whatever liability the contract imposes upon him for a breach of that agreement. As an illustration of a "promissory restraint," the Restatement cites a lessee's agreement not to assign the leasehold without the consent of the lessor who owns the land in fee simple absolute. Such "promissory restraints" are valid *only* if (1) "the restraint is qualified so as to permit alienation to some though not all possible alienees," and (2) "the restraint is reasonable under the circumstances ..." *Id.* § 406.

To determine whether a "restraint on alienation" exists in the first instance, we believe that the key consideration is whether a "contractual liability" may be imposed upon the owner who conveys his property without the consent of the noteholder notwithstanding a "due on sale clause" in the form of the one in issue in this case. Section 404 of the Restatement defines "contractual liability" in Comment g, as follows:

"g. *Contractual liability.* 'Contractual liability,' within the meaning of that phrase as used in [the definition of 'promissory restraint'], exists when the effect of making a conveyance in violation of the restraint is that the person so making such conveyance is subject either to damages, or, in a proper case, to equitable relief by way of specific performance or an injunction, or some combination of these types of relief. ... Sometimes the only available remedy may be one for damages, and that even may be only a remedy for nominal damages. If this is true, of course, the promissory restraint does not operate as a significant impediment to the alienation of property."

This definition of "contractual liability" has the effect of drastically circumscribing the definition of "restraint on alienation," of which it is a component part. Unless the owner may be subject to damages, specific performance, injunction or a combination of these forms of relief, there exists no "restraint on alienation" as that term is defined and used in the Restatement of Property. In light of the deed of trust as a whole and the promissory note involved in this case, we do not find that the owner is subject to any, or a combination, of the specified forms of relief in the event he conveys the property without the approval of the noteholder. Our interpretation is based upon the following.

The word "damages" is manifestly used in Comment g in the sense of ordinary money damages, recoverable for a harm sustained because of another's breach of duty. In the present context damages are recoverable only for "non-performance of any contractual duty of immediate performance." Restatement of Contracts, § 312. *See also Id.* §§ 314, 327. In the context of promissory restraints, the "duty" arises from the owner's promise not to convey his property without the consent of the other contracting party. Restatement of Property, § 404, illustrations 2, 4. Because the violation of such a duty is apt to amount to nothing more than the violation of a bare legal right, without any real, practical or substantial harm of certain measurement,

Comment g of Section 404 cautions that the nominal damages recoverable in such cases do not operate as a significant impediment to alienation. In any event, the "damages" spoken of in Comment g refers to those sums recoverable because of a harm that occurs to the *other* contracting party *as a result of the owner's breach of a qualified or unqualified promise not to convey his property without consent. It does not refer to sums recovered through a trustee's sale or a suit on the promissory note.*

Turning now to the "due on sale clause" in the present case, it is plain that the owner's promise is *not* one to the effect that he will obtain the noteholder's approval before conveying the property. *Cf. Id.* § 404, Comment g, illustrations 2, 4; § 413(1). In fact, he promises nothing with regard to his future conduct and he is free to obtain the owner's approval or not, depending upon his preceding decision to assume or not the risk of acceleration. The only legal consequence of his selling the property without such approval is to create in the noteholder a corollary right to elect to accelerate the note, and not a right to sue for damages, injunction or specific performance. A court may not, under such a clause as this, compel the owner to choose one course of action or the other, for he has not promised one to the exclusion of the other and under the express terms of the clause, he is free to do either. Under the same reasoning, and *assuming* that some harm is occasioned the noteholder by an unapproved conveyance, the owner is not liable for damages in doing what he has a right to do under the contract, for he can breach no duty in such a case.

To conclude our discussion of the Restatement of Property, as it bears on promissory restraints on alienation, we note that we are instructed to prefer a construction of a

possible restraint so that there is no such result. *Id.* § 418. Because we find the "due on sale clause" in this case to be unambiguous, there exists no necessity for such interpretation on our part; however, if any such necessity existed, we believe the reasonable interpretation of the clause to be consonant with what we have stated above and there existed no *duty* on the part of the owner to refrain from conveying the property without the approval of the noteholder, and the owner is not subject to a suit for damages, specific performance or injunction if he does so.[9] He does, of course, assume the risk that the noteholder might accelerate the indebtedness in such event but the maker would not be liable for any harm occasioned by the unapproved conveyance.

We hold, then, that the "due on sale clause" involved in this case is not a "restraint on alienation." We base our holding on the proposition that the clause now in issue will not, if enforced as written, result in any evil the rule against such restraints was designed to prevent. *Mattern v. Herzog, supra.* In addition, it is based on the proposition that no "contractual liability" may be imposed, under such a clause, against the owner who conveys without the noteholder's consent; hence, there exists no significant restraint. Restatement of Property, § 404. We express no opinion on whether a prepayment penalty provision in a promissory note would constitute a "contractual liability" under the same or a similar clause. There is no such penalty provision involved in this case.

If the clause in issue did constitute a restraint on alienation, we would nevertheless be required to enforce it in this case because it is expressly qualified by the requirement of reasonable conduct on the part of the noteholder, which implies that

---

**9.** It must be borne in mind that the deed of trust in this particular case prohibits, in fact, the noteholder's obtaining a deficiency judgment or damages in any other kind of claim against the maker of the note, Foremost having agreed to look only to the proceeds of a trustee's sale for satisfaction in the event the maker failed to pay the note or perform any other covenant or agreement in the promissory note or deed of trust. See p. 821, *supra. Crestview,* having taken conveyance "subject to" the lien of the deed of trust, has no exposure to money damages, specific performance or injunction in any event, because it has not assumed any duty at all in favor of the noteholder, nor made any promise of its own to the noteholder.

alienation is permitted to some though not all possible alienees. *Id.* § 406. In addition, we find the restraint reasonable in the circumstances, which consisted of a large deferred payment of the purchase price in a commercial transaction involving the purchase and sale of an office building, the purchase price being payable over fifteen years, with no penalty for early payment, in whole or in part. *Id.* § 406, Comment i.

We will reply to the matters contained in the dissenting opinion. That opinion recites verbatim Crestview's lengthy statement of the nature of the case, as set forth in its brief in this Court. From this undigested information, the dissenting opinion draws the conclusion that a temporary injunction should have been granted by the trial court to preserve the *status quo* pending a jury trial. Inexplicably, however, the opinion does not illuminate precisely *why* Crestview is entitled to this extraordinary relief under the rules which govern the grant or denial of temporary injunctions. It merely concludes that Crestview *should* have such relief, apparently in the mistaken belief that there is a relevant factual dispute requiring resolution by a jury. This mistake results from confusion as to the limited nature of Crestview's appeal to this Court.

Crestview appealed to this Court on the basis of evidence that it says is *undisputed.* It raises here, as in the trial court, this *question of law* : Is the "due on sale clause" enforceable, in such undisputed circumstances, in the face of the rule against restraints on alienation and under the applicable principles of equity? This question of law is the basis of Crestview's appeal. And because the dissenting opinion implies the contrary, and implies that a temporary injunction may issue merely upon the basis of some unarticulated policy or a court's surmise or intuition, we are compelled to lengthen this opinion by a more detailed discussion.

Crestview brought only three points of error for our review: (1) that the proper standard for our review should be whether Crestview presented in the trial court a *prima facie* case for injunctive relief under Article 4642, § 4, *supra,* rather than whether the trial court abused its discretion in refusing to issue a temporary injunction; (2) that the trial court erred in its conclusion that the "due on sale clause" may be enforced when, under the undisputed evidence, there exists no threat to the noteholder's security; and (3) that the trial court erred in its conclusion that Crestview will not suffer an irreparable injury in the absence of a temporary injunction. We have discussed heretofore the first two points of error. We do not reach the third because of our holding on the second.

For the purpose of our discussion of the second point of error, we assumed as true Crestview's contention that Foremost refused to approve the sale for the exclusive purpose of coercing an increase in the interest rate or a reduction in the debt, and that the sale posed no risk to the note's security. These are the facts that Crestview says are undisputed. Under its theory, these facts would constitute, as a matter of law, an unreasonable basis for Foremost's refusing to approve the sale. Moreover, Foremost's consequent acceleration of the installment debt would as a matter of law, under this theory, constitute unfair, inequitable and oppressive conduct so as to justify injunctive relief, the acceleration being based upon an unreasonable refusal to approve the sale. Having concluded that Foremost was not forbidden as a matter of law, under the language and meaning of the "due on sale clause," to base its decision on the totality of the circumstances, including the interest-rate differential, the trial court found that Foremost had *not* acted unreasonably, unfairly, inequitably or oppressively. It then denied the temporary injunction requested by Crestview.

■ Though we thought it unnecessary, we will expand our discussion of the rules applicable to appellate review of a trial court's decision on an application for temporary injunction, as they bear on this case. The function of a temporary injunction is obviously to preserve the *status quo,* or the "last, actual, peaceable, noncontested status which preceded the pending controversy."

While that is the function of a temporary injunction, the preservation of the *status quo* is not *per se* a basis for its issuance. It may issue in cases of this kind only on a showing by the applicant of a probable injury and a probable right to recover after final hearing. Tex.Rev.Civ.Stat.Ann. arts. 4642, 4663; *Transport Co. of Texas v. Robertson Transports*, 152 Tex. 551, 261 S.W.2d 549 (1953); *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526 (Tex.1975). The trial court was, in this case, presented initially with the key question of whether Crestview showed a probable right to a permanent injunction after final hearing, which depended solely upon the correctness of its theory that a "due on sale clause" of the kind here in issue is, as a matter of law, enforceable only to prevent an impairment of the noteholder's security. The solitary basis for permanent and temporary injunctive relief alleged by Crestview in its original petition was this interpretation of the "due on sale clause." *Crestview sought neither a temporary nor a permanent injunction on any other ground.* Our discussion of this question of law constitutes the "frills" referred to in the dissenting opinion. We may be excused, however, if we point out that it is also a reasoned discussion of the law and the parties' respective appellate contentions as to the sole basis alleged for temporary injunctive relief. Our holding that the clause is not so limited in its scope validates the trial court's conclusion to the same effect. The dissenting opinion does not complain, suggest or imply that we have ruled erroneously on this question of law—the only ground in the record upon which the trial court or this Court could base a conclusion that Crestview will probably prevail on the merits.

The dissenting opinion cites four cases, all of which affirm the trial court's exercise of discretion in *issuing* a temporary injunction, in contrast to the present case where the trial court declined to issue the writ. In those four cases, the hearing on temporary injunction revealed the existence of "complicated" or "substantial" factual disputes, as well as disputes about questions of law. In the present appeal, the parties join issue solely on the one question of law posed by Crestview: whether the "due on sale clause" is enforceable when it is undisputed that the noteholder's security is not threatened by the sale. The case before us is not one involving an attack upon the sufficiency of the evidence adduced in the hearing on temporary injunction or how disputed facts may bear on a complicated question of law. Rather, as stated in Crestview's point of error, the question before us is whether "the trial court abused its discretion in denying the temporary injunction because it refused to apply the proper legal standards to the *undisputed facts.* (emphasis supplied)."

We may reverse the trial court's decision only when that court has clearly abused its discretion. There is no such abuse when the trial court bases its decision on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978). Each of the four cases cited in the dissenting opinion fall under this rule. In contrast, where the appeal raises only a question of law applicable to conceded or undisputed facts, as Crestview contends is the case here, we are required to determine whether the trial court erred in making the decision it did, on that question of law. If we find that the trial court did apply the law erroneously, its error in that respect constitutes the requisite abuse of discretion to justify reversal. *Southland Life Ins. Co. v. Egan*, 126 Tex. 160, 86 S.W.2d 722 (Tex. Comm'n App.—1935, opinion adopted); *Camp v. Shannon*, 162 Tex. 515, 348 S.W.2d 517 (1961). On the other hand, if the trial court did not err in its decision on that question of law, under conceded or undisputed facts, there is no abuse of discretion and we may not reverse the order of the trial court. *See* Casenote, 40 Texas L.Rev. 409 (1962).

■ An abuse of discretion does not occur if a temporary injunction is refused because the applicant fails to show a probable right to recover after final hearing. *Camp v. Shannon, supra.* We hold in this case that Crestview failed to make such a showing, even if the facts are undisputed, because its theory as to the permissible

scope of the "due on sale clause" is, in our view, wrong.

Moreover, we may not find an abuse of discretion if "some basis" exists for the trial court's decision on the application for temporary injunction. *Davis v. Huey, supra.* We have held that Foremost could, under the clause in question, reasonably base its refusal on a reason apart from whether the sale posed a risk to the debt's security. We find in the record sufficient evidence to support the trial court's finding that Foremost acted reasonably in the totality of the circumstances, which included the matter of the interest-rate differential compared to the unpaid balance and the unexpired term of the note. On the other hand, even if we were to apply Crestview's theory as to the limited permissible scope of the "due on sale clause," we find, contrary to the contention of Crestview, that the facts are not undisputed as to whether the sale posed a risk to the noteholder's security. There is, in fact, a conflict in the evidence in that respect. Nevertheless, from the conflict there emerges sufficient evidence to support the trial court's finding that Foremost acted reasonably in refusing to approve the sale. For example, Mr. Schmidt, Crestview's own witness, established the following: Crestview was a limited partnership, Doerring & Associates, Inc., a California corporation, being the general partner; Doerring's business consisted primarily of managing apartment projects and brokering real estate sales or exchanges for investors; Doerring's brokerage fees were large but sporadic; Doerring conducted its business as the general partner in limited partnerships in about two-thirds of its ventures, and as a tenant in common in the remaining one-third; Doerring had no actual cash investment in the limited partnership known as Crestview, Ltd.; Doerring had no experience in the management of office buildings; Doerring's corporate financial statement was never furnished to Foremost pursuant to the latter's request therefor, instead Foremost was furnished the financial statements of several of Doerring's shareholders who expected to guarantee payment of the note held by Foremost; these prospective guarantors had a large net worth dependent in the main upon highly-mortgaged real property; if Schmidt, one of the prospective guarantors, attempted to borrow $400,000 solely on the strength of his financial statement he would, in his opinion, be unable to get such a loan; at the time of the negotiations for Foremost's approval of the sale, the note payments were in arrears and there had been chronic difficulty in its obtaining prompt payment of the installments; and, the seller to Crestview, in the sale wherein Foremost's approval was sought, had refused to accept Crestview's promissory note for approximately $400,000, to be secured by a lien on the property inferior to Foremost's, in part payment of the purchase price and to enable Crestview to reduce the principal sum of the note held by Foremost.

■ Where there is conflicting evidence, the trial court does not abuse its discretion in refusing to grant a temporary injunction, for there is then "some basis" for the court's refusal. *Davis v. Huey, supra.*

■ There exists, however, another basis for the trial court's refusal to grant a temporary injunction in this case. It is undisputed that Crestview knew, before it purchased the property, that Foremost had not approved the sale and might accelerate the indebtedness under the plain right it had to do so under the "due on sale clause." Mr. Schmidt's testimony establishes without question that Crestview intentionally took the risk that its legal theory might be wrong. Its knowledge of the facts was enough to cause Crestview, if it were to act with reasonable prudence, to decline the purchase, to bring an action to determine the scope or validity of the "due on sale clause" before consummating the sale, or otherwise to act to protect itself from the irreparable harm averred by it as a basis for temporary injunction. Crestview did nothing in that regard, preferring instead to consummate the transaction and *then* seek equitable relief from the courts to preserve its position in the face of the events it set in motion and the prejudicial situation that

now exists. If Crestview is to sustain an injury in these circumstances, the injury will be self-inflicted. Equity will not be interposed to relieve one who so intentionally takes such risks by consummating transactions while knowing that his pertinent legal rights are in dispute. *Wortham v. Thompson*, 81 Tex. 348, 16 S.W. 1059 (Tex. 1981); *Pollard v. Steffens*, 161 Tex. 594, 343 S.W.2d 234 (Tex.1961). In these circumstances, the trial court could properly relegate Crestview to whatever remedy it might have at law. *Carpenter v. Southern Properties, Inc.*, 299 S.W. 440 (Tex.Civ.App. —Dallas 1927, writ ref'd); *Turner v. Neel*, 231 S.W.2d 660 (Tex.Civ.App.—San Antonio 1950, writ ref'd n. r. e.).

Since we have found "some basis" for the trial court's refusal to grant the temporary injunction, whether the facts be disputed or not, we may not hold that the trial court abused its discretion. We therefore affirm its order.

PHILLIPS, Chief Justice, dissenting.

I respectfully dissent.

In my judgment, this case, divested of frills, presents the question of whether a lender fortified by a "due on sale" provision in the mortgage agreement can enforce that agreement in a subsequent sale solely for the purpose of securing a higher interest rate, such a change of rate not having been provided for in the mortgage contract.

This, apparently, is a case of first impression in Texas; however, a case with similar facts has recently been decided by the New York Court of Appeals, *Silver v. Rochester Savings Bank*, 73 A.D.2d 81, 424 N.Y.S.2d 945 (1980).

In *Silver*, where the due-on-sale clause contained a provision that the approval of the mortgage would not be unreasonably withheld, the court held that the normal inference to be drawn from the due-on-sale clause is that the lender is concerned about the security of the mortgage upon the transfer of ownership of the property. It concluded that the parties intended the clause to grant to the bank only the right to approve the charter and financial ability of the buyer and not to authorize it to alter the terms of the mortgage by raising the interest rate thereon as a condition of approval. For a similar conclusion see *Continental Federal Savings & Loan Association v. Fetter*, 564 P.2d 1013 (Okl.1977).

This brings us to the controlling point in this case which is whether the trial court abused its discretion in denying the injunction. I would hold that it did.

The pertinent facts are as follows.

This attempted foreclosure involves the sale in 1979 of an office building located in Austin, Texas, by a Michigan corporation, Foremost Insurance Company (appellee), to a California partnership, Crestview Company, the managing general partner of which is Robert I. Feirman, and a subsequent sale of the property in 1980 to an unrelated California limited partnership, Crestview, Ltd. (appellant), the general partner of which is Doerring & Associates, Inc., a California corporation with offices in San Diego and Austin. Foremost is attempting to foreclose on the property now owned by Crestview, Ltd., under a "due-on-sale" clause in a deed of trust. Crestview, Ltd., claims that Foremost is not entitled to foreclose because Foremost unreasonably withheld its consent to the sale and seeks to enjoin the sale until this issue is determined at the trial on the merits.

The property at issue is a three-story office building located on a seven-acre tract on South I.H. 35. Foremost purchased the land and constructed the building in 1972 for one of its subsidiaries which was in the business of servicing mobile home loans for mobile home dealers. The subsidiary stopped doing business in Austin in 1975 and the building remained vacant for nearly a year. Foremost then hired a local company, Parker-Bienvenu Company, to act as its leasing agent and to manage the building. The building was leased to various tenants until 1978 when Foremost decided to place the building on the market.

In October of 1978, Foremost entered into an agreement to sell the property for $1,000,000 to Robert I. Feirman with the

understanding that title would be taken in the name of a then undisclosed partnership of which Feirman would be the general partner. The sale was closed on February 16, 1979, and title was taken in the name of Crestview Company, a California partnership. Crestview Company paid $160,000 cash to Foremost and executed a no-liability promissory note for $840,000 payable over 15 years at 9.5% interest. Foremost felt that the building was adequate security and that a 9.5% rate of interest was a sound investment. The note was secured by a deed of trust of which Foremost was the beneficiary. Foremost insisted that a due-on-sale clause be included in the deed of trust which would require Feirman to obtain Foremost's consent to any future sale. Feirman agreed to the inclusion of the due-on-sale clause only on the condition that it be modified to provide that Foremost shall not unreasonably withhold its consent. The agreed upon clause appears as paragraph 28 in the deed of trust and provides that:

> "In the event Grantors, or any owner of the Mortgaged Premises, without first obtaining approval of Noteholder (*which approval shall not be unreasonably withheld*), should sell or otherwise dispose of the Mortgaged Premises, or any part thereof, at any time before this Deed of Trust is fully released and discharged, Noteholder shall have the option to declare the indebtedness hereby secured due and payable...." (Emphasis added).

Crestview Company employed Parker-Bienvenu- to continue leasing and managing the property. Two of the tenants subsequently moved from the building and Crestview Company experienced difficulty in making the monthly payments on the note. Feirman requested that Foremost grant a six-month moratorium on the interest-only portion of the monthly payments so that the vacancy problem could be solved, but Foremost refused to make any concessions.

In August of 1980, Crestview Company entered into an agreement with James T. Hoover, Executive Vice President of Doerring & Associates, Inc., to sell the property for $1,250,000. On August 21, 1980, an attorney for Doerring & Associates, Inc., wrote a letter to Foremost attaching a copy of the agreement and requesting Foremost to execute the standard "estoppel letter" required under the agreement and advising Foremost that if it needed further information about the transaction or the purchaser to please contact the attorney or Fred Schmidt, Vice President of Doerring & Associates, Inc. The attached estoppel letter advised Foremost that the property would be sold to a limited or general partnership of which Doerring & Associates would be the general partner.

On September 12, 1980, Foremost responded with a letter requesting financial information on the proposed purchasers including financial statements from the controlling shareholders of the corporation, Doerring & Associates, Inc., and information relative to their management experience and expertise. The letter concluded:

> "As you are no doubt aware, Section 28 of the Renewal Deed of Trust dated February 16, 1979 requires the approval of the note holder before any sale or other disposition of the mortgaged premises by the grantors. Upon completion of a thorough review of the requested information, I will advise you further of Foremost's position in this matter."

The admitted purpose of that paragraph of the letter was to put Doerring & Associates on notice that Foremost intended to use the leverage it had as a result of the due-on-sale clause.

Fred Schmidt responded to Foremost's letter by sending to Foremost on September 23, 1980, a company profile on Doerring & Associates, Inc., which set out the history of the company, the market research and statistical analysis it makes in acquiring properties, the fact that its holdings included properties in Odessa, Abilene, Brownwood, San Angelo, Austin and San Antonio, as well as properties in California and Colorado, and information regarding the qualifications and real estate experience and expertise of its key personnel. Detailed financial statements of the three controlling shareholders were also provided which revealed

that they had a total net worth in excess of $2.4 million.

A few days later, Schmidt called Foremost's office and talked to Ken Snedegar, Foremost's vice president in charge of real estate, Tom Frain, and John Rigas, a corporate attorney. Schmidt asked them what Foremost's position was going to be on the sale and Snedegar replied that they wanted the interest rate increased from 9.5% to 12.0%. Schmidt explained the reasons why he did not believe an increase was appropriate and Snedegar said he would get back to him. Schmidt called Snedegar twice more and each time Snedegar said Foremost still wanted a 12.0% interest rate. At the end of the third conversation, Schmidt asked Snedegar for a written response to the request for consent and Snedegar said that Jack Siebers, a Foremost vice president and attorney, was preparing a letter stating that Foremost objected to the sale because of concerns about credit worthiness and lack of management experience. These concerns had not been mentioned in any of the prior conversations.

Sieber's letter of September 30, 1980, stated that Foremost was unable to approve the sale because Foremost had concluded "for the following reasons, among others, that the proposed purchasers present a substantial investment risk:

1. The financial statements indicate a heavy reliance on real estate investments the values of which are speculative and heavily mortgaged.
2. The financial statements submitted indicate the existence of substantial liabilities for each of the proposed purchasers.
3. The proposed purchasers have failed to provide sufficient evidence of expertise in office building management."

The letter concluded that, "Should you provide Foremost at some future date with additional financial and/or business information relative to the proposed purchaser sufficient to overcome Foremost's present concerns, Foremost would be willing to reconsider its position at that time."

By letter dated October 16, 1980, Schmidt provided such additional information to Siebers, including: that $30,000–$40,000 would be allocated to renovate and upgrade the building; that a substantial operating reserve would be established which would provide additional security to Foremost; that Doerring & Associates would relocate its management company to the building thereby leasing 3,500 square feet of the vacant space and providing on-site management; that the values of the real estate holdings shown on the financial statements were based on actual cash investments or on values currently in escrow or to be sold in the immediate future, that the validity of those values could be verified by contacting two M.A.I. appraisers; that the financial capability of Doerring & Associates, Inc., could be verified by contacting the financial references provided in the company profile; that its current inventory of properties exceeds $40 million and over $11 million of property was in escrow; that its management personnel had extensive experience; and again requested that Foremost consent to the sale "or provide specific reasons why Foremost Insurance Company's security for their loan will not be equal to, if not substantially increased by our acquisition, capital improvements and on-site management."

When he had had no response to his letter, Schmidt called Siebers and Siebers told him that Foremost would consent to the sale if Foremost were paid $400,000 as a reduction on the principal of the note. Schmidt was shocked at that proposal; he had never heard of a lender demanding a 50% pay-down on a note as the price of giving consent. Siebers confirmed the demand in a letter the same day. Schmidt discussed the matter with his partners and they decided that if Foremost were sincere about its concerns of "investment risk," Schmidt and his two partners would offer to guarantee personally repayment of the note and to retain the Parker-Bienvenu Company to continue managing the building. Snedegar previously had told Schmidt that Foremost was satisfied with Parker-

Bienvenu's management of the building, and Schmidt knew the offer of three personal guarantees would improve substantially Foremost's security since the existing note was a no-liability note. Schmidt thus believed that his offers would eliminate any sincere concerns Foremost might have had. Schmidt spelled out his offers in a letter to Siebers dated October 27, 1980. Siebers replied by letter dated October 31, 1980, saying that Foremost still would not approve the sale and that any future correspondence should be directed to the present owner of the property.

Schmidt did not believe that Foremost could validly enforce the due-on-sale clause under these circumstances, so he and his partners decided to go ahead and close the sale. The sale was closed on November 14, 1980, and Crestview Company conveyed an undivided 83.05% interest to Crestview, Ltd., and an undivided 16.95% to Doerring & Associates, Inc. In simultaneous transactions, Doerring & Associates conveyed its 16.95% interest to the limited partners of Crestview, Ltd., and the limited partners conveyed those interests to Crestview, Ltd., so that Crestview, Ltd., acquired a 100% interest in the building and seven acres on which it was situated. Since the sale, Crestview, Ltd., has tendered the monthly payments every month to Foremost.

On December 15, 1980, Foremost gave notice that it was accelerating the note under the due-on-sale clause and would pursue its remedies. Crestview, Ltd., filed suit on December 22, 1980, seeking a declaratory judgment and temporary and permanent injunctions enjoining Foremost from accelerating the note and foreclosing under the due-on-sale clause of the deed of trust. On February 5, 1981, Foremost posted notice that it intended to sell the property at a trustee's sale to be held on March 3, 1981. A temporary injunction hearing was held on February 17 and 18, 1981. At the conclusion of the hearing, the trial judge announced that he would deny the injunction, even though if he were the President of Foremost, he would not do what Foremost is attempting to do. The order denying the temporary injunction was signed on Febru-

ary 19, 1981, and findings of fact and conclusions of law were signed on March 3, 1981. Crestview, Ltd., perfected this appeal by filing its deposit in lieu of cost bond on February 25, 1981, and on the same day filed with this Court a motion for leave to file petition for writ of injunction pending appeal. This Court conducted a hearing on February 27, 1981, granted the motion and issued an injunction enjoining foreclosure pending final disposition of the merits of this appeal.

Two strong arguments in favor of the court's granting an injunction emerge from the facts listed above. The first is the fact that under the original sale of the building, the appellee Foremost, the lender, looked solely to the building for security as the vendee's avoided personal liability on the mortgage. The second, is that the subsequent purchasers agreed that, in addition to the security afforded by the building itself, they themselves would assure personal liability on the note. Moreover, the subsequent purchasers are, apparently, financially sound, both personally and as corporate entities.

Although the appellate courts are loathe to find trial courts in abuse of discretion, the rule must not become so all-encompassing as to deny an appellant his right to a full and thorough review of a denial of a temporary injunction. *General Telephone Co. v. City of Wellington,* 156 Tex. 238, 294 S.W.2d 385 (1956).

Additionally, I would hold that the *status quo* should have been preserved until the questions presented herein can be finally determined at the trial on the merits. Deliberate action is essential for the accurate determination of legal rights and upon occasion this can be secured only by issuing a temporary decree protecting a *status quo.* *Southwest Weather Research, Inc. v. Jones,* 160 Tex. 104, 327 S.W.2d 417 (1959). This principle has been applied in foreclosure cases where the courts held that when substantial questions are presented, it is proper to reserve decision of those questions by the issuance of a temporary injunction until the

facts and law are fully developed at a trial on the merits. *Smith v. Vial,* 555 S.W.2d 215 (Tex.Civ.App.1977, no writ); *Irving Bank & Trust Co. v. Second Land Corp.,* 544 S.W.2d 684 (Tex.Civ.App.1976, writ ref'd n. r. e.); *Branham v. Short,* 526 S.W.2d 639 (Tex.Civ.App.1975, no writ).

Appellee Foremost has no authority to be sole judge of its own unreasonableness. The laws of this State give a jury the authority to decide ultimately whether Foremost unreasonably withheld its consent. Until the jury can decide that question, Foremost should not be allowed to foreclose.