**Margarita PEREZ, As Independent Executrix of the Estate of Macario Perez, Substituted in Place and Stead of Macario Perez, Deceased, and Sam Attaguile, Plaintiffs-Appellees,**

v.

**JEFFERSON STANDARD LIFE INSURANCE COMPANY, a Corporation, Defendant-Appellant.**

No. 85–1072.

United States Court of Appeals, Fifth Circuit.

Jan. 29, 1986.

Marvin Sloman, Jeffrey S. Levinger, Dallas, Tex., Sam Sparks, El Paso, Tex., for defendant-appellant.

---

**11.** 714 F.2d 648, 650 (6th Cir.1983).

**12.** *See id.; Levine v. United States,* 478 F.Supp. 1389, 1391 (D.Mass.1979).

Jeffrey B. Thompson, Malcolm McGregor, Gus Rallis, El Paso, Tex., for plaintiffs-appellees.

Before BROWN, REAVLEY and ROBERT M. HILL, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiffs Macario Perez and Sam Attaguile have recovered $2,000,000 from Jefferson Standard Life Insurance Company on a claim that Jefferson Standard unreasonably withheld consent to the cancellation of a lease of property in a shopping center owned by Perez and Attaguile. We reverse for the reason that there is no evidence of Jefferson Standard doing anything that it was not legally entitled to do.

## A.

The financing and security instruments executed on January 25, 1974 by Jefferson Standard and plaintiffs' predecessor in title included a non-recourse note in the original principal amount of $2,700,000, payable in monthly installments of $22,230 for a period of 27 years. The holder of the note was given the option of declaring the full indebtedness due in the event the owner transferred the shopping center property without the prior written consent of the holder. That consent was not to be unreasonably withheld. As security for the loan, in addition to a deed of trust on the shopping center, the owner of the property assigned to Jefferson Standard its lease with F.W. Woolworth Company by virtue of which Woolco was the major tenant in the shopping center. Under the assignment Jefferson Standard was entitled to receive the Woolco monthly rental of a minimum of $19,772. The shopping center owner was bound not to cancel or accept a surrender of the lease, or to reduce the rent or diminish the obligation of Woolworth, without the written consent of Jefferson Standard.

Jefferson Standard's loan was thus secured by the monthly rental payments and financial strength of F.W. Woolworth. In October of 1982, however, Woolworth announced its decision to close its Woolco stores nationwide. By this time plaintiffs Perez and Attaguile owned the shopping center. They received on October 8 a letter from Woolworth giving notice with respect to this particular Woolco store. Under Woolworth's lease the owners were entitled to cancel the lease if they acted within 90 days from October 4. If not timely canceled, the lease provisions relieved Woolworth of any potential obligation for percentage rental and required only the $19,772 monthly payment for the remainder of the lease term. After the 90 days passed on January 2, 1983, the Woolco store was closed, and subsequently Woolco subleased at a substantial profit to it over the monthly rentals it was required to pay to the plaintiff owners. The plaintiffs contended by this suit that their loss of the right to lease these premises anew, and the substantial difference between that larger income and what they are resigned to receiving from Woolworth, was damage suffered because Jefferson Standard wrongfully and unreasonably withheld consent for transactions which the plaintiffs would otherwise have effected.

## B.

The Jefferson Standard offices are located in Greensboro, North Carolina. Plaintiffs reside in El Paso, Texas, the site of the shopping center. There were five letters exchanged between the parties during October, November and December of 1982. They constitute the mainframe for the disposition of this case.

On October 8 Hansel Beeson, supervisor of loan administration for Jefferson Standard, wrote to plaintiffs to remind them that the lease could not be canceled or modified without the consent of Jefferson Standard and to request that he be advised of their plans with respect to the Woolco store. This letter was received by plaintiffs in El Paso on October 12.

Plaintiff Attaguile and his attorney, Gus Rallis, successively, made telephone calls to

Beeson on October 18 and November 1. The discussions included expression of interest in a possible sale of the entire shopping center to a church. Beeson told both of the callers to provide him with specific proposals and with supporting financial statements for any proposed purchaser of the property.

On November 2 attorney Rallis wrote to Beeson and enclosed a proposed contract of sale of the shopping center to the Abundant Living Faith Center together with a letter from the pastor of the church, stating his interest in purchasing the property, as well as confidential ledger sheets indicating that the church organization had liquid assets of $253,000 and a fund balance that had grown from $56,000 to $521,-000 from the first of 1981 to August of 1982. Debts were shown to be $160,000. The terms of the sale required the church to pay plaintiffs $800,000 at closing. There was also a letter from an El Paso banker expressing respect for the leadership of the church, which he said had been a small organization in 1975 but was then entitled to "medium five-figure" loans from the bank.

On November 8 the attorney for Jefferson Standard, Jerry L. Eagle, responded with this letter:

Mr. Gus Rallis
Attorney at Law
2301 Montana
El Paso, Texas 79903
    Re: Perez & Attaguile
         Loan No. 00 259
         Woolco Lease
Dear Mr. Rallis:

I have been asked to respond to your letter of November 2, 1982, which letter, together with the material accompanying such letter, has been discussed by Mr. Beeson and other investment personnel of our Company. While I am not certain whether you intended in your letter to ask for our consent to the termination of the Woolco lease as well as the transfer of the property to the Abundant Living Faith Center, I will address both points.

Our investment people are not willing to unconditionally release Woolco from its lease obligations. They did indicate they would be willing to consider releasing Woolco if a satisfactory retail tenant is found to replace Woolco under lease terms at least as favorable as the Woolco lease terms. They also indicated they would be willing to consent to such release upon a substantial reduction being made in the loan amount. While they did not get specific as to what they meant by a substantial reduction, I assume they have in mind an amount equal to the present value of the future Woolco lease rentals.

Our investment people are also unwilling to consent to the transfer of the property to the Abundant Living Faith Center and that entity's use of the property for other than retail purposes.

Yours very truly,
Jerry L. Eagle

This letter was read over the telephone to Attaguile when he called Beeson on November 9. Attaguile and Rallis called again on November 16 urging approval of the sale to the church. They were told that Jefferson Standard would not accept the credit of the church as a substitute for the liability of Woolworth on its lease. They were again told that any proposals for other security for Jefferson Standard should be put into writing.

Rallis wrote to Beeson on November 16 threatening to bring a lawsuit unless consent was given to the sale of the shopping center to the church. That letter read as follows:

Mr. Hansel C. Beeson
Jefferson Standard Life Insurance Co.
P.O. Box 21008
Greensboro, NC 27420
    Re: Perez & Attaguile
         Loan No. 00259
         Woolco Lease
Dear Mr. Beeson:

After our conversation this morning, I again want to re-urge the proposition before I take the matter into court. The essence of it is as follows:

The Deed of Trust prevents a transfer of the property without prior consent of the Trustee; however, that consent cannot be "unreasonably withheld." The present purchaser, Abundant Living Faith Center, is a qualified buyer with a substantial net worth. My client, Macario Perez, is willing to act as a co-guarantor for the purchaser, thus giving you double security on the property. The present market value of the property is probably worth twice the balance owing on the mortgage note.

In addition, the purchasers are willing to increase the interest on the note to 11 percent. Further, they are willing to pay the mortgage balance in ten years, although the note will still be amortized for the approximate 18-year period.

If I do not hear from you within ten (10) days, my client has instructed me to file suit.

> Yours truly,
> Gus Rallis

Eagle responded on behalf of Jefferson Standard as follows:

> November 18, 1982
> Mr. Gus Rallis
> Attorney at Law
> 2301 Montana
> El Paso, Texas 79903
> > Re: Perez & Attaguile
> > Loan No. 00 259
> > Woolco Lease
> Dear Mr. Rallis:
> This is in response to your November 16 letter to Mr. Beeson.
> It seems as if you and your client are insistent that we treat your client's proposal as if it involves nothing more than a transfer of the fee ownership of our security property. Furthermore, it seems that you and your client are insistent that we admit that your client's proposal is a reasonable one and that our Company does not have the right to object to such proposal if it is reasonable. It appears to me that your client is really asking that we also consent to the release of Woolco from its lease obligations. If in fact that is not the case,

then please write to me and give me a detailed description of exactly what it is that your client wants. If he is asking that we consent to the release of Woolco from its lease obligations in consideration of the terms set forth in your November 16, 1982 letter, then the answer is no. As my November 8 letter pointed out, we cannot consider releasing Woolco from its lease obligations without obtaining a satisfactory replacement credit or having our loan principal substantially reduced.

> If in fact your client is merely asking that we consent to the transfer of the subject property and if Woolco will continue to be liable under its lease, then your client should write to us and so inform us. Unless and until we are informed that this transaction does not involve the release of Woolco, we will continue to treat it as effecting a release of Woolco, in which event our requirements are as set forth in the preceding paragraph.

> Yours very truly,
> Jerry L. Eagle

Jefferson Standard received no written reply and heard nothing from plaintiffs until a telephone call from El Paso on December 16. The discussion included the possibility of a meeting in Greensboro on December 20 or 21. Plaintiffs were told, during that conversation and by follow-up letter from Beeson, that the meeting would not be fruitful unless a specific proposal was made to respond to Eagle's letter of November 18. Various other proposals were discussed by telephone on December 22 and 23, but no written response was ever made to Eagle's November 18 letter to Rallis.

## C.

Plaintiffs filed this suit on March 28, 1983 complaining of the unreasonable withholding of consent to sell the shopping center to Abundant Living Faith Center, Inc., a/k/a Charles Nieman Ministries. Damages were alleged to be $2,100,000. By the first amended original complaint

filed in January of 1984, plaintiffs complained of both the refusal to consent to the sale to the church as well as withholding consent to cancel the Woolworth lease. At the trial plaintiffs withdrew their complaint with respect to the denial of consent to sell to the church, and the jury was asked only about the lack of consent for the cancellation of the Woolworth lease. The jury was instructed as follows:

> The term "unreasonable withholding of consent" means that a decision to withhold consent is made without any reasonable basis. In this case, the question is whether there was any reasonable basis under the circumstances for the decisions by Defendant Jefferson Standard Life Insurance Company to withhold its consent to the termination of the Woolworth lease.

The jury found that the consent was unreasonably withheld, that this was the proximate cause of damages to the plaintiffs, and that those damages were $2,000,000.

### D.

As we see the problem in this case, it is not so much a review of the evidence to see whether reasonable persons could differ with the jury verdict, an exercise by the standard of *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc), as it is a search in this record for something that Jefferson Standard did which under the Texas law would raise a fact issue of unreasonableness. Our reading of the Texas cases reflects support for the lender withholding consent for any change in position that would either impair his security or would be objectionable for valid business reasons. In *Sonny Arnold, Inc. v. Sentry Sav. Ass'n*, 633 S.W.2d 811 (Tex.1982), the Supreme Court of Texas held that a due-on-sale clause was not a prohibited restraint on alienation; and that a lender was entitled to condition its consent to the transfer of the property upon an increase in the interest rate, for the reason that this served a valid business purpose. The lender was entitled to maintain its profit and to update the loan portfolio to meet current interest rates as of the time of the proposed transfer. In *Crestview, Ltd. v. Foremost Ins. Co.*, 621 S.W.2d 816 (Tex.App.—Austin 1981, writ ref'd n.r.e.), the Texas court held that a lender could withhold consent to a transfer on any reasonable basis, including the protection of its security and a review of all existing circumstances, which would permit reexamination of the interest rate in view of the current prevailing interest rates. Our court, following Texas law, has held that the lender is reasonable in giving consideration to all factors that would be relevant to the making of a new loan, when considering whether consent is to be given to a transfer. *Casey v. Business Men's Assur. Co. of America*, 706 F.2d 559 (5th Cir.1983).

### E.

It is certainly a valid business purpose, which any lender would be entitled to serve, to ensure that his secured position will not be impaired or worsened. So long as this is the basis for withholding consent to a transfer or change in position, it cannot be said to be improper or unreasonable. While the lender may not close his eyes to apparent facts, he is entitled to decide his position on the facts known to him. If that position is far better than the lender appreciates, the one seeking the consent must acquaint the lender with the true facts.

Plaintiffs' position is this: The Woolworth lease was unfavorable to plaintiffs and to the shopping center. The value of the leased premises was considerably greater than the amount Woolworth was paying. The value of the shopping center would have been enhanced by the cancellation of the Woolco lease. Since the real estate is security for Jefferson Standard's loan, the lender has diminished its own security by its failure to consent. Therefore, its true purpose must have been to coerce payment of the loan. But if the purpose was to serve its own security, Jefferson Standard was so mistaken as to have been unreasonable.

That argument confuses plaintiffs' own interests with valid interests of Jefferson Standard, and it overlooks facts important to the latter interests. We are not concerned here with the reasonableness to plaintiffs of any plans they might have held in 1982 or of the outcome of losing the opportunity to cancel the Woolworth lease. We are only to decide whether Jefferson Standard acted for a valid business reason in rejecting a specific request made by plaintiffs.

Eagle made Jefferson Standard's position very clear. The transfer to the church and abandonment of the shopping center operation was unsatisfactory. The release of Woolworth could be justified only by substitution of another tenant on comparable terms or by some other benefit such as the payment of a substantial part of the outstanding loan principal. That request for value in exchange for the value to be relinquished was perfectly proper. Jefferson Standard's position never changed, but its requirements received neither satisfaction nor definitive response from plaintiffs. There was talk of different concessions but no specific plan was put before Jefferson Standard for it to accept or reject. The failure of negotiations, whatever these were, lay with plaintiffs and not Jefferson Standard.

Plaintiffs argue that, because their expert testified that the general practice of lenders making loans of this nature is to rely on the value of the real estate for security and not to be concerned with the leases, a fact issue was raised about the importance to Jefferson Standard of the Woolworth lease. There is no fact issue but that Woolworth's lease virtually assured the monthly payments on the loan; indisputably, that was an important and valuable security to Jefferson Standard. And the record establishes that Jefferson Standard always considered the Woolworth commitment as vital to the loan. When it was first being negotiated, Jefferson Standard committed to a $3,000,000 loan based on monthly Woolworth payments of $21,492. When the owners concluded the Woolworth lease for monthly rental pay-ments of only $19,722, Jefferson Standard reduced its loan commitment to $2,700,000 on which total monthly payments of $22,230 were required.

Jefferson Standard cannot be faulted for refusing to give up the monthly rental assured by the financial strength of F.W. Woolworth Company in exchange for the underlying real estate value of property to be operated as administrative offices of the Abundant Living Faith Center. Plaintiffs contend that the underlying value of the property itself was sufficiently large to secure Jefferson Standard and to answer completely any objection to that modification of position. That is a question upon which Jefferson Standard was required neither to debate nor concern itself. The potential value of property subject to foreclosure is simply not the same security to a lender as monthly payments guaranteed by Woolworth. Lenders want to be paid according to schedule and not to be forced to go to court or to foreclose on underlying security.

Perhaps we could be satisfied today, or on the day of trial, that the cancellation of the Woolworth lease would have been followed by another lease of equal benefit to Jefferson Standard, and it may well be that Jefferson Standard's position would not have suffered in the least. Prior to surrendering its protection in 1982, however, Jefferson Standard was entitled to insist upon assurance that substitute security would be provided. It would be unreasonable to ask a rational lender to do otherwise, and that is the converse of plaintiffs' position.

There is no evidence in this record that Jefferson Standard made any claim or refused any request that it was not legally entitled to make or refuse. If entitled to take that position under the Texas law, it could not be held to have been unreasonable in doing so.

The district court judgment is reversed. The case is remanded to that court for dismissal.

REVERSED